**Sol LESSINGER and Edith Lessinger, Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 502, Docket 88–4110.**

United States Court of Appeals, Second Circuit.

Argued Dec. 9, 1988.

Decided March 29, 1989.

Bruno Schachner, New York City, for appellants.

Robert S. Pomerance, Tax Div., Dept. of Justice (William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen, Barbara I. Hodges, of counsel), for appellee.

Before OAKES, Chief Judge,
KEARSE and CARDAMONE, Circuit Judges.

OAKES, Chief Judge:

Taxpayers Sol and Edith Lessinger appeal from that portion of a decision of the United States Tax Court, Charles E. Clapp II, Judge, finding them liable for income taxes of $113,242.55 for the tax year 1977 and $608.50 for the tax year 1978. *Lessinger v. Commissioner*, 85 T.C. 824 (1985). Because Ms. Lessinger argues that she is an "innocent spouse" and should escape any liability that may be imposed on her husband, *see* I.R.C. § 6013(e) (Supp. IV 1986), we will review the question of Mr. Lessinger's liability first. We will refer to him as the taxpayer.

The Tax Court found, and the parties seem to agree, that section 351 of the Internal Revenue Code governs the transaction at issue here. Section 351 provides for the nonrecognition of income when a controlling shareholder transfers property to a corporation. The taxpayer here transferred the assets and liabilities of a proprietorship he operated to a corporation he owned for reasons entirely unrelated to tax planning. It is clear that he was oblivious to the ramifications of his actions in terms of his tax liability. Prior to the consolidation, the proprietorship had a negative net worth. Nevertheless the Tax Court found that the taxpayer had to recognize a gain because he transferred liabilities to the corporation which exceeded his adjusted basis in the assets of the proprietorship. The Tax Court applied section 357(c) of the Code, which is an exception to the general rule of nonrecognition in section 351 transactions. Under section 357(c), gain is recognized to the extent that a transferor-shareholder disposes of liabilities exceeding the total adjusted basis of the assets transferred. I.R.C. § 357(c) (1982).

The taxpayer attacks the Tax Court's decision from two directions. First, he argues that the Tax Court overstated the amount of liabilities transferred, because, he claims, he did not actually transfer short-term accounts payable to the corporation. His second argument is that the Tax Court understated the amount of assets transferred. The Tax Court decided to ignore a $255,500 accounting entry which, the taxpayer argues, represented his personal debt to the corporation and should be counted as a transferred asset.

Sol Lessinger operated a proprietorship under the name "Universal Screw and Bolt Co." for over twenty-five years prior to 1977. Since 1962 he was also the sole shareholder and chief executive officer of Universal Screw & Bolt Co., Inc. Both

businesses were engaged in the wholesale distribution of metal fasteners, and they were conducted from the same location on Ninth Avenue in New York City.

In 1976, the factor that had provided working capital to the proprietorship refused to continue lending funds to it as a noncorporate entity because under New York law one can charge higher interest rates of a corporation. *See* N.Y.Gen. Oblig.Law § 5–521 (McKinney 1978) (corporation prohibited from interposing defense of usury). The taxpayer instructed the individual who was his attorney and accountant to do whatever was necessary to make the proprietorship a corporation. The Universal proprietorship was then consolidated into the Universal corporation in 1977. The Tax Court found that the taxpayer was not informed of the details of the transaction.

The proprietorship's unaudited balance sheet dated December 31, 1976, shows that the business had a negative net worth. A summary of the balance sheet, with amounts rounded to thousands, reads as follows:

*Assets*

| | |
|---|---|
| Cash, accounts receivable, and inventory | 1,314 |
| Marketable securities and mutual funds | 267 |
| Fixed assets (net of depreciation) | 106 |
| Other (good will, prepaid expenses, etc.) | 46 |
| Total assets | approx. 1,733 |

*Liabilities and Capital*

| | | |
|---|---|---|
| Trade accounts payable | | 416 |
| Notes payable due within one year | | 991 |
| (Breakdown: Chemical Bank | 203 | |
| Trade | 464 | |
| Auto loan & ins. | 9 | |
| Trefoil (factor) | 315) | |
| Misc. (due to broker, taxes, loans, and exchanges) | | 12 |
| Accrued expenses | | 162 |
| Notes payable due after one year | | 342 |
| (Breakdown: Chemical Bank | 338 | |
| Trade | 4) | |
| Sol Lessinger—capital | | (190) |
| Total liabilities and capital | | approx. 1,733 |

The consolidation of the proprietorship into the corporation was conducted in a most casual manner, the transfer transaction being naked in its simplicity. The taxpayer already owned all of the corporation's stock, and no new stock was issued. There were no written agreements documenting the transfer. On January 1, 1977, the proprietorship's bank account was closed, and the corporation took over the proprietorship's operating assets. Only two items of any significance were not transferred: The taxpayer had borrowed funds from Chemical Bank to purchase mutual fund shares, and the shares secured the loan. These items appear on the balance sheet above as the mutual fund shares and the Chemical Bank loan. The taxpayer retained the shares and sold them to pay the loan himself later in January 1977.

The corporation expressly assumed the other proprietorship liabilities except accounts payable. All notes payable were changed to show that the corporation was the maker of the notes, and the debt to the factor was expressly assumed. While the corporation did not expressly assume liability for the proprietorship's accounts payable, it did pay those accounts during the first six months of 1977.

On June 1, 1977, journal entries were made to the corporation's books to reflect the consolidation. Various corporate asset accounts were debited (i.e., increased) to show the addition of the proprietorship's assets, and corporate liability accounts were credited (i.e., increased) by the amount of the proprietorship's liabilities. Total proprietorship liabilities exceeded total proprietorship assets by $255,499.37, and that amount was debited to a corporate asset account in an entry entitled "Loan Receivable—SL." A ledger sheet entitled "Sol Lessinger" showed the debit with the description "[m]erger of company" as well as a $3,500 debit for a personal debt the corporation paid for Sol.

When in January 1977 the taxpayer sold his mutual funds, he used the proceeds not only to pay off the partnership's Chemical Bank loan, but also, with the remaining $62,209.35, to pay the corporation part of his $259,000 debt to it. Thus, at the end of 1977, he owed $196,790 to the corporation. In 1981, Marine Midland Bank, a principal creditor of the corporation, requested that the taxpayer execute a promissory note for the debt, and he did so, the note being used as collateral for the bank's loan to the corporation. No interest was ever paid on

the debt, however, and the debt had risen to $237,044 by the end of 1982, by which point the corporation was insolvent. The corporation's retained earnings were $29,638 at the beginning of 1977 and $38,671 at the end of 1977, so the taxpayer's debt to the corporation greatly outweighed his equity in it.

The taxpayer's personal wealth, however, was not limited to that of the corporation (or the mutual fund shares which he sold in 1977). He also owned a realty corporation called "87–89 Chambers Street Corporation" ("Chambers") that, at the time of the consolidation, held about $41,000 in cash equivalents and a long-term leasehold of the premises the corporation occupied. The taxpayer introduced into evidence an appraisal of the property which was conducted in 1980 and which valued the leasehold at $230,000 as of January 1, 1977. The corporation paid Chambers only enough rent to cover Chambers' expense of running the building, while a fair rental might have been $31,000 per year more. Thus, to a certain extent, Sol may be said to have subsidized the manufacturing corporation by that amount each year.

## DISCUSSION

■ The first question is whether section 351 applies when no new shares are issued to the shareholder, having in mind the statutory language that a transfer must be made "solely in exchange for stock or securities." *See* § 351(a). The Tax Court strained somewhat to analyze this case under, and perhaps to overrule, the case of *Abegg v. Commissioner,* 50 T.C. 145 (1968), *aff'd on other grounds,* 429 F.2d 1209 (2d Cir.1970), *cert. denied,* 400 U.S. 1008, 91 S.Ct. 566, 27 L.Ed.2d 621 (1971), involving transfer under section 367 by a nonresident alien to a wholly-owned corporation. We agree, however, with the Tax Court's ultimate conclusion that the exchange requirements of section 351 are met where a sole stockholder transfers property to a wholly-owned corporation even though no stock or securities are issued therefor. Issuance of new stock in this situation would be a meaningless ges-

ture. *See Jackson v. Commissioner,* 708 F.2d 1402, 1405 (9th Cir.1983); *Commissioner v. Morgan,* 288 F.2d 676, 680 (3d Cir.), *cert. denied,* 368 U.S. 836, 82 S.Ct. 32, 7 L.Ed.2d 37 (1961); *cf.* Rev. Rul. 73–473, 1973–2 C.B. 115; *Parkland Place Co. v. United States,* 354 F.2d 916 (5th Cir.1966) (per curiam) (transferor stockholders receiving only securities and no stock in exchange for property qualified for nonrecognition under section 351). Indeed, we do not read the taxpayer's brief as contending the contrary.

The taxpayer's principal argument, broadly stated, is that section 357 is inapplicable to him because in neither an accounting nor an economic sense did he realize a gain. He "merely exchanged creditors" from trade creditors to Universal, and his gain, therefore, was a "phantom" which Congress did not intend to tax.

Narrowly stated, the taxpayer's argument takes two different forms, each of which complements the other:

First, the corporation did not take the affirmative action necessary to assume the trade accounts payable of the taxpayer's proprietorship, in contrast to its affirmative action to assume the notes payable. He argues that New York law did not even permit the "assumption" of the taxpayer's obligations by the corporation because to have done so would have rendered it insolvent, thus making payments by it to his creditors fraudulent transfers. *See* N.Y. Debt. & Cred. Law § 273 (McKinney 1945).

Second, even if the corporation did "assume" the taxpayer's trade accounts payable, there was no taxable gain since he contributed "property," that is, the account receivable from him in the approximate amount of $250,000, which, contrary to *Alderman v. Commissioner,* 55 T.C. 662 (1971), should be deemed to have a basis equal to its face value.

The Commissioner responds with the general, unchallenged proposition that discharge of indebtedness may be income. I.R.C. § 61(a)(12) (1982); *Diedrich v. Commissioner,* 457 U.S. 191, 102 S.Ct. 2414, 72 L.Ed.2d 777 (1982); *United States v. Kirby Lumber Co.,* 284 U.S. 1, 52 S.Ct. 4, 76

L.Ed. 131 (1931). The Commissioner argues that the taxpayer had a negative net worth with liabilities "tantamount to personal debts" which he was "essentially relieved from meeting" by virtue of the incorporation.[1]

■ Whether the corporation assumed the proprietorship's accounts payable is a factual question to be determined under state law. *See Beaver v. Commissioner*, 41 Tax Ct. Mem. Dec. (CCH) 52 (1980); *Parsons v. Commissioner*, 31 Tax Ct. Mem. Dec. (CCH) 290 (1972). The Tax Court found that "[t]he corporation did in fact pay the liabilities [, and the] record is clear that [Lessinger] intended that the corporation should pay the liabilities in the normal course of business." 85 T.C. at 837. The Tax Court rejected Lessinger's argument that the payments were made merely as advances to him. We accept these factual findings. The Commissioner argues that principles of state law that would impose liability on a corporation to protect its alter ego's creditors demonstrate that the corporation here assumed the taxpayer's liabilities. But we do not think that the answer to the assumption question is dispositive, for whether "affirmative" assumption was required or occurred concerns form more than substance. We find it sufficient that the debts were paid, because their payment by the corporation represents the type of relief from liability that section 357(c) was intended to tax.

The taxpayer argues further that New York law precluded assumption of the short-term accounts payable. New York Debtor and Creditor Law § 273 (McKinney 1945) declares that paying or undertaking an obligation that would render one insolvent is fraudulent as to creditors if the payment is made or the obligation is incurred without fair consideration. The Tax Court ignored the taxpayer's purported new debt to the corporation. Under the Tax Court's analysis, then, the corporation would have been insolvent if it assumed the

accounts payable. The Commissioner does not respond to this argument. We may safely ignore it, however, because we believe that the taxpayer's debt to the corporation was a real asset for the corporation.

■ Having determined that the proprietorship's accounts payable should be included in the category of liabilities assumed, we must determine whether the taxpayer's purported debt to his corporation would offset those liabilities and prevent a net excess of liabilities over assets. The obligation which the taxpayer owed to his wholly-owned corporation, it must quickly be conceded, was not as well documented as a debt to a third party would be.

A journal entry of the corporation showed $255,499.37 as a loan receivable from the taxpayer, which in turn was posted on a general ledger sheet as a debit to the taxpayer's account. That account was credited with a $62,209.35 adjustment resulting from the sale of the taxpayer's mutual funds and the paydown of the Chemical Bank loan. No credits on account of subsidized rent, *see supra* at 2343, were made, and the debit balance of $196,790 in the taxpayer's account after the adjustment was never paid down; instead it increased to the sum of $237,044 in 1982. Marine Midland Bank required the open account to be formalized in 1981 in a note which collateralized the bank's loan to the corporation.

The Tax Court refused to count the debt as "property" transferred in the transaction, although its reasoning is not explicit. First, the opinion says that the corporate accounting entry entitled "Loan receivable —[Sol Lessinger]" "merely represents the excess of the liabilities over the adjusted basis," noting that the debt was not at first represented by a promissory note and that Lessinger paid no interest on it. The Tax Court then cites a decision in which it had ignored an entry that the taxpayer had characterized as an "artificial receivable." 85 T.C. at 837 n. 8 (citing *Christopher v. Commissioner*, 48 Tax Ct. Mem. Dec.

---

1. Nowhere is there the slightest hint or innuendo that the taxpayer had a tax avoidance purpose so as to fall under § 357(b). Rather it can be said—if the Commissioner were to prevail— that the factor's demand for higher interest led Lessinger into a § 351 "trap."

(CCH) 663 (1984)). The Tax Court opinion concludes that "[e]ven if [Lessinger] had executed a note, it would have a zero basis in the hands of the corporation." *Id.* at 837 (citing *Alderman v. Commissioner*, 55 T.C. 662 (1971)). The Tax Court thus apparently believed there were two independently sufficient reasons to ignore the debt: first, that it was artificial, and, second, that it would have had a zero basis.

We are unpersuaded by the argument that the obligation was artificial. The Commissioner argues:

> This open account was not so much a debt as it was an accommodation by the corporation to its president and sole shareholder, who was having liquidity problems. In effect, he caused the corporation to apply its assets to satisfy his personal obligations, including those owed to trade creditors which were shortly to fall due, intending to pay the money back only as and when he found it convenient to do so.

Brief at 35.[2] The Commissioner points out that the receivable lacked a due date, interest, security, or "other accepted features of true debt," but this analysis begs the question we have before us. The Commissioner's argument is not aided by likening this case to *Carolina, Clinchfield and Ohio Railway v. Commissioner*, 823 F.2d 33 (2d Cir.1987) (per curiam), where an existing debt was replaced by a new debt payable ten centuries later, the present value of which was two quadrillionths of a cent. We believe that the receivable was an enforceable demand obligation. The decisions that the Commissioner cites for the definition of "true debt" concern the advance of funds to a close corporation by its shareholders. *Gilbert v. Commissioner*, 248 F.2d 399, 402 (2d Cir.1957); *see also Raymond v. United States*, 511 F.2d 185, 190 (6th Cir.1975). A taxpayer in that setting may seek to mischaracterize a capital contribution as debt in order for the corporation to be able to treat the obligation in a way that would disguise nondeductible dividends as deductible interest payments. In that context, the courts have defined "classic debt" narrowly as "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest," although the essential factor is a "binding obligation." *Gilbert*, 248 F.2d at 402.

We believe, however, that a due date, interest, and security are not necessary to characterize Lessinger's obligation *to* his corporation as debt, and that his obligation was binding. The promissory note he signed in 1981, which the corporation endorsed to Marine Midland as collateral for a loan, is significant because it shows that Marine Midland depended on his personal responsibility. And, in general, it is obvious that the creditors of the corporation continued to do business with it on the strength of the taxpayer's personal credit (whether as evidenced by the liability on the books or by operation of New York law protecting creditors of a partnership that is succeeded by an alter ego corporation, *e.g., Reif v. Williams Sportswear, Inc.*, 9 N.Y.2d 387, 174 N.E.2d 492, 214 N.Y.S.2d 395 (1961); *Woodland–Nursing Home Corp. v. Harris*, 514 F.Supp. 110 (S.D.N.Y. 1981), *aff'd mem.*, 697 F.2d 302 (2d Cir. 1982)). Lessinger received consideration when he gave his promise to the corporation, and we have no doubt that any court would enforce that promise to protect the corporate creditors if the corporation failed, even in the absence of alter ego liability. We conclude that the taxpayer's obligation to the corporation was real, not artificial.

We now turn to the Tax Court's second reason for ignoring the debt. The Tax Court quoted *Alderman, supra*, which, like our case, involved the incorporation of an accrual basis proprietorship with a negative net worth. In *Alderman*, the Tax Court disregarded the taxpayers' personal promissory note to their corporation because

---

**2.** We note the "accommodation" and the "[i]n effect," as we previously noted the argument that there were liabilities "tantamount to personal debts" which the taxpayer was "essential-ly" relieved from meeting. These slippery little phrases do not inspire confidence in the Commissioner's argumentation.

[t]he Aldermans incurred no cost in mak-ing the note, so its basis to them was zero. The basis to the corporation was the same as in the hands of the transferor, i.e., zero. Consequently, the application of section 357(c) is undisturbed by the creation and transfer of the personal note to the corporation.

55 T.C. at 665; *see also* Rev. Rul. 68–629, 1968–2 C.B. 154–55 (same). *Alderman* purported to follow the literal language of the Tax Code. Section 357(c) does support the *Alderman* court's reliance on the concept of basis, but the statutory language is not addressed to a transaction such as Lessinger's, where the transferor's obligation has a value to the transferee corporation. The *Alderman* court did not consider the value of the obligation to the transferee.

Section 357(a) provides that generally, the corporation's assumption of the transferor's liabilities should cause no recognition of gain:

> Except as provided in subsection[ ] ... (c), if—
>
> (1) the taxpayer receives property which would be permitted to be received under section 351, ... without the recognition of gain if it were the sole consideration, and
>
> (2) as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or acquires from the taxpayer property subject to a liability,
>
> then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351....

I.R.C. § 357(a) (1982). Subsection (c)(1) then provides an exception:

> (c) Liabilities in excess of basis
> (1) In general
>> In the case of an exchange—
>> (A) to which section 351 applies,
>>
>> . . . .
>
> if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the *adjusted basis* of the property transferred pursuant to such exchange, then such excess shall be considered as a gain....

*Id.* § 357(c) (emphasis added). In general, then, the "adjusted basis" of the property transferred is crucial to the calculation.

"Basis," as used in tax law, refers to assets, not liabilities. Section 1012 provides that "[t]he basis of property shall be the cost of such property, except as otherwise provided." Liabilities by definition have no "basis" in tax law generally or in section 1012 terms specifically.[3] The concept of "basis" prevents double taxation of income by identifying amounts that have already been taxed or are exempt from tax. 3 J. Mertens, *Law of Federal Income Taxation* § 21.01, at 11 (1988). The taxpayer could, of course, have no "basis" in his own promise to pay the corporation $255,000, because that item is a liability for him. We would add parenthetically that to this extent *Alderman* was correct in describing the taxpayers' note there. But the corporation should have a basis in its obligation from Lessinger, because it incurred a cost in the transaction involving the transfer of the obligation by taking on the liabilities of the proprietorship that exceeded its assets, and because it would have to recognize income upon Lessinger's payment of the debt if it had no basis in the obligation.[4]

---

**3.** Basis is "the original cost of property used in computing capital gains or losses for income tax purposes." *Webster's Third New International Dictionary* 182 (1963). It is a "[t]erm used in accounting, especially in tax accounting, to describe the value of an asset for purpose of determining gain (or loss) on its sale or transfer or in determining value in the hands of a donee of a gift." *Black's Law Dictionary* 138 (5th ed.1979). Derived from "[a]cquisition cost, or some substitute therefor," it is the "amount assigned to an asset for income tax purposes." *Id.*

**4.** Our approach requires acceptance of the fact that section 362(a), which requires a carryover basis for "property" transferred in nonrecognition transactions under section 351, cannot be applied to the corporation's valuation of its receivable from the taxpayer. The purpose of the predecessor to section 362 was to avoid allowing the corporation a new, stepped-up basis from which to deduct depreciation expenses. *Republic Steel Corp. v. United States,* 40 F.Supp. 1017, 1022 (Ct.Cl.1941); *see also* 3 J. Mertens, *Law of Federal Income Taxation* § 21.01, at 15

Assets transferred under section 351 are taken by the corporation at the transferor's basis, to which is added any gain recognized in the transfer. § 362(a). Consideration of "adjusted basis" in section 357(c) therefore normally does not require determining whether the section refers to the "adjusted basis" in the hands of the transferor-shareholder or the transferee-corporation, because the basis does not change. But here, the "basis" in the hands of the corporation should be the face amount of the taxpayer's obligation.[5] We now hold that in the situation presented here, where the transferor undertakes genuine personal liability to the transferee, "adjusted basis" in section 357(c) refers to the transferee's basis in the obligation, which is its face amount.[6]

Yet the Commissioner says that to reverse the Tax Court would, as *Alderman*, 55 T.C. at 665, suggested, "effectively eliminate section 357(c) from the Internal Revenue Code." Would it? The question of substance is whether the taxpayer in fact realized a gain from the transaction. He certainly did not do so by a cancellation of his indebtedness. If there was any cancellation, it was illusory: While his trade creditors at the time of the incorporation may have been paid off (or their accounts rolled over as a result of sales and payments by the corporation and further advances of credit by the trade creditors), the taxpayer's indebtedness to the corporation itself continued (except to the extent he paid it

off). If Lessinger had a "gain" from the incorporation, it did not show up in his personal balance sheet, let alone by way of economic benefit in his pocket.

■ The purpose of section 357(c) is to provide a limited exception to section 351's nonrecognition treatment that operates, as the Commissioner reminds us here, "where the transferor realized economic benefit which, if not recognized, would otherwise go untaxed." Brief at 27 (quoting *Focht v. Commissioner*, 68 T.C. 223, 235 (1977)). Section 351 was intended to allow changes in business form without requiring the recognition of income. *Bongiovanni v. Commissioner*, 470 F.2d 921, 924 (2d Cir.1972); *Raich v. Commissioner*, 46 T.C. 604, 608 (1966). The transferor-shareholder recognizes income only to the extent that he receives boot in the form of money or other property. § 351(b). In 1938, the Supreme Court held that under the predecessor of section 351, section 112 of the Revenue Act of 1928, any assumption of liability by the transferee would be considered a payment of money or property to the transferor, causing the transferor to recognize income. *United States v. Hendler*, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018 (1938). Congress reacted immediately by enacting section 112(k) of the Internal Revenue Code of 1939, the predecessor of section 357(a), which provided that the assumption of a liability should *not* be considered the payment of property or money and should not provoke the recognition of gain. *See*

---

(1988) (the purpose of special basis rules for nonrecognition transactions is, in general, to prevent the transferee from having a stepped-up basis). Another purpose of transferred bases generally is to defer recognition of gain or loss. *See, e.g.*, Steiner, *Liabilities in Excess of Basis in Corporate Reorganizations—When Should Gain be Recognized?*, 6 J. Corp. Tax'n 39, 40 (1979) (noting that when section 357(a) provides nonrecognition of gain upon the assumption of liabilities, "[a]s in the case of most nonrecognition provisions, this gain potential is preserved in the property received"). In Lessinger's transaction, there simply were no gains or losses to be deferred. The excess of liabilities over assets (which Lessinger's promise to the corporation remedied) was caused by the proprietorship's insolvency—the excess of current payables over current receivables—rather than by unrecognized gain in any asset's basis.

5. The Commissioner does not suggest that the obligation was so worthless as to warrant reduction of its face amount. We note as well that we do not here address the problem of an obligation whose present value is significantly lower than its face amount.

6. Curiously, the Commissioner does not actually make *Alderman's* zero-basis argument. The taxpayer, on the other hand, attempts to convince us that, as an accrual basis taxpayer, he had a "basis" in his personal obligations to the corporation. We note, however, that the fact that he would have had a liability on his books does not require the conclusion that he had a "basis" in it for tax purposes.

*Focht,* 68 T.C. at 232 & n. 21 (quoting section 112(k) and its legislative history).

Congress did not add section 357(c), which requires the recognition of gain when liabilities exceed assets, until 1954, when a House committee referred to the section as an "additional safeguard[ ] against tax avoidance not found in existing law." H.R.Rep. No. 1337, 83d Cong., 2d Sess. 40, *reprinted in* 1954 U.S.Code Cong. & Admin.News 4017, 4066 ("House Report"). Some provision was necessary to ensure that manipulations of credit and depreciation were not used to realize tax-free gains. *Focht,* 68 T.C. at 235. The House and Senate committees that approved section 357(c) both cited a single example of a transaction that the section was intended to govern: If a taxpayer transfers property with an adjusted basis of $20,000 subject to a $50,000 mortgage, he should recognize $30,000 gain. House Report at A129, *reprinted in* 1954 U.S. Code Cong. & Admin.News at 4267 (describing what was then called § 356); S.Rep. No. 1622, 83d Cong., 2d Sess. 270, *reprinted in* 1954 U.S.Code Cong. & Admin.News 4621, 4908. While some have argued that section 357(c) was designed to avoid a negative basis,[7] its application in the Congress's example is also quite reasonable. The transferor, who has already benefited by depreciating the property or holding it while its value appreciates, has income because he will never have to pay the mortgage. Forcing the taxpayer in our case to recognize a gain, however, would be contrary to Congress's intent because it would tax a truly phantom gain, because his liability to the corporation, as we have said, was real, continuing, and indirectly, at least, enforceable by the corporation's creditors.

That section 357(c)'s language can be construed to require unjust and economically unfounded results is clear from the continuing debate over other aspects of the section's operation. In *Rosen v. Commissioner,* 62 T.C. 11 (1974), *aff'd mem.,* 515 F.2d 507 (3d Cir.1975), for example, the Tax

Court held that a transferor had to recognize gain from the assumption of liabilities, even though he remained personally liable and, in fact, paid the obligations himself. The Tax Court commented on section 357(c)'s harshness, noting that it "may even result in the realization of a gain for tax purposes where none in fact exists." *Id.* at 19. After oral argument, counsel for the Commissioner directed us to a case upholding the constitutionality of section 357(c). The court in that case, however, was not confronted with an exception to its optimistic observation that "[i]t is only when some tax benefit occurs, for example depreciation or further indebtedness on the property which yields tax-free cash not included in cost, that the liabilities will exceed the adjusted basis therein." *Wiebusch v. Commissioner,* 59 T.C. 777, 781, *aff'd per curiam,* 487 F.2d 515 (8th Cir. 1973). While we do not rest our decision today on constitutional grounds, we note that *Wiebusch's* analysis would not apply here.

Section 357(c) was amended in 1978 to solve a problem that had forced the courts to fashion delicate constructions of the section's language in order to conform with legislative intent. A cash basis transferor has no basis in accounts receivable. The Tax Court originally held that such a transferor would have to recognize gain if, after counting her accounts payable as transferred liabilities, liabilities exceeded assets. *See Raich, supra.* This analysis meant that the owner of almost any ongoing business transferred liabilities exceeding assets when incorporating. The Tax Court later developed an approach that excluded accounts payable from liabilities, *see Focht, supra,* after this court and the Court of Appeals for the Ninth Circuit announced different interpretations that achieved this result. *See Bongiovanni, supra; Thatcher v. Commissioner,* 533 F.2d 1114 (9th Cir.1976). Congress added section 357(c)(3) in 1978, and it now excludes from subsection (c)(1) "a liability the payment of which

---

7. *E.g.,* Cooper, *Negative Basis,* 75 Harv.L.Rev. 1352, 1358–60 (1962) (arguing that Congress created section 357(c) only to prevent the transfer-

or from accumulating a negative basis in his stock in the transferee-corporation).

... would give rise to a deduction." This history, while not directly relevant to Lessinger,[8] is instructive. In *Bongiovanni*, "a too literal reading of the words of the statute [would have] produce[d] an inequitable result which cannot be allowed to stand," 470 F.2d at 924, and "Congress certainly could not have intended such an inequitable result especially in light of its expressed purposes in enacting Sections 351 and 357(c)," *id.* at 925. We find those words equally applicable here.

We conclude that our holding will not "effectively eliminate section 357(c)." Lessinger experienced no enrichment and had no unrecognized gains whose recognition was appropriate at the time of the consolidation. Any logic that would tax him would certainly represent a "trap for the unwary." *Bongiovanni*, 470 F.2d at 924 (quoting the Commissioner's characterization of the Tax Court's early treatment of cash basis taxpayers under section 351). Lessinger could have achieved incorporation without taxation under the Commissioner's theory by borrowing $260,000 cash, transferring the cash to the corporation (or paying some of the trade accounts payable personally), and later causing the corporation to buy his promissory note from the lender (or pay it off in consideration of his new promise to pay the corporation). If taxpayers who transfer liabilities exceeding assets to controlled corporations are willing to undertake genuine personal liability for the excess, we see no reason to require recognition of a gain, and we do not believe that Congress intended for any gain to be recognized.

Our decision under section 357(c) makes it unnecessary to consider Edith Lessinger's claim for relief as an "innocent spouse." Judgment reversed. The Tax Court found Mr. Lessinger liable for $114,147.30 for the tax year 1977 and for $1,427.50 for 1978, and it found Mrs. Lessinger liable for $113,242.55 and $608.50 for those years, respectively. The record on appeal does not indicate how these amounts were calculated, but it appears that some part(s) of the deficiencies were unrelated to the question we addressed. We therefore remand for recalculation of the deficiencies, if any, and make our remand applicable to *both* years.

**8.** Section 357(c)(3) is inapplicable because Lessinger's proprietorship was on the accrual basis. None of the liabilities would have produced deductions if paid by the transferor because those expenses had been previously deducted when they were entered in the proprietorship's records. *See* 3A Stand.Fed.Tax Rep. (CCH) ¶ 2530.04 (1989).