T.C. Memo. 1996-191


UNITED STATES TAX COURT


DONALD J. AND JUDITH E. PERACCHI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22511-93.              Filed April 22, 1996.

        Ps contributed three parcels of real property and
their unsecured promissory note to their wholly owned
corporation.  The parcels were encumbered by deeds of
trust securing debt obligations in amounts that were in
excess of the combined adjusted basis of the parcels in
the hands of Ps.  The face amount of Ps' promissory
note was greater than the excess of the encumbering
liabilities over Ps adjusted basis in the properties.
<u>Held</u>:  Ps failed to carry their burden of proving that
their unsecured promissory note constituted genuine
indebtedness.  Under sec. 357(c)(1), I.R.C., Ps are
required to recognize gain measured by the excess of
the debt obligations secured by deeds of trust over Ps'
adjusted basis in the real property.

Craig A. Houghton, for petitioners.

Mary P. Kimmel, for respondent.

MEMORANDUM OPINION

NIMS, Judge: Respondent determined a $172,967 deficiency in petitioners' 1989 Federal income tax. The deficiency results from respondent's determination that petitioners realized a $566,806 gain on the transfer of certain properties to their wholly owned corporation, and the resulting arithmetically required reduction in the deductible amount of a conceded casualty loss.

Since the parties agree that the deductible amount of petitioners' casualty loss will follow from the resolution of the property transfer issue, the sole issue for decision is whether petitioners must recognize gain on the transfer under section 357(c). Petitioners agree that they are entitled to no deduction for their casualty loss if respondent's determination is sustained on the section 357(c) issue. Unless otherwise noted, all section references are to sections of the Internal Revenue Code in effect for 1989, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The parties submitted this case fully stipulated, and the facts as stipulated are so found.

Petitioners were residents of Fresno, California, at the time they filed their petition. During the year at issue, petitioners owned 100 percent of NAC Corporation, a Nevada

Corporation, which had two wholly owned subsidiaries, National American Life Insurance Company of Pennsylvania, a Pennsylvania Corporation (NALICO), and Western States Administrators, a California Corporation (WSA).

During 1989, both NALICO and WSA required infusions of additional capital. Because of significant 1989 losses in its accident and health insurance business, NALICO required additional capital in order to satisfy general industry guidelines and State law requirements relating to the maintenance of a premium-to-capital ratio of not more than 10 to 1. WSA required additional capital in order to maintain, on a consolidated basis, a minimum net worth of $7 million pursuant to a bank loan agreement. As of September 30, 1989, NAC Corporation, WSA, and NALICO had a consolidated net worth of $5,841,436.

Petitioners undertook to satisfy these capital requirements by transferring three parcels of improved real property, and their $1,060,000 unsecured promissory note (the Capital Note), to NAC Corporation, the parent corporation of the two capital-deficient, wholly owned subsidiaries. As of December 31, 1989, petitioners had a net worth far in excess of the consolidated net worth of NAC Corporation, WSA, and NALICO.

The first of the three parcels, the Clinton Way Property, had a fair market value of $1,870,000 on December 26, 1989, the

date of transfer, and an adjusted basis of $349,774.06 in the hands of petitioners on that date.  As of that date, the Clinton Way Property was encumbered by a deed of trust in favor of Standard Insurance Company securing a note (the Standard Insurance Note) having an unpaid principal balance of $1,386,654.50.  NAC Corporation did not assume liability under the Standard Insurance Note, on which petitioners remained personally liable.

The second and third of the three parcels of real property which petitioners transferred to NAC Corporation, collectively referred to herein as the Fresno/Herndon Property, had a fair market value of $1,200,000 on December 26, 1989, the date of transfer, and an adjusted basis of $631,632.42 in the hands of petitioners on that date.  As of that date, the Fresno/Herndon Property was encumbered by a deed of trust securing a note (the Bunn & Duran Note) in favor of certain individuals having an unpaid principal balance of $161,558.28.  NAC Corporation did not assume liability under the Bunn & Duran Note, on which petitioners remained personally liable.  The parties agree, however, that the Fresno/Herndon Property, when transferred to NAC Corporation, remained "subject to" the Bunn & Duran Note.

The following table reflects the computation of the excess of the above-described liabilities over petitioners' combined

adjusted basis in the three parcels of real property transferred by petitioners to NAC Corporation on December 26, 1989:

| Property | Liability | Adjusted Basis |
|---|---|---|
| Clinton Way | $1,386,654.50 | $349,774.06 |
| Fresno/Herndon | 161,558.28 | 631,632.42 |
| Total | 1,548,212.78 | 981,406.48 |

The combined excess of liabilities over petitioners' adjusted basis was thus $566,806.30.

On December 26, 1989, petitioners also transferred their Capital Note in the face amount of $1,060,000 to NAC Corporation. The Capital Note was unsecured. It purported to be petitioners' unconditional promise to pay NAC Corporation interest at the rate of 11 percent per annum in monthly installments commencing February 1, 1990, and continuing in each consecutive month to and including January 1, 1995. Beginning February 1, 1995, monthly installments of $23,046.97 were payable until all principal and any accrued but unpaid interest were paid in full, with any remaining balance due January 1, 2000.

The Capital Note provided for acceleration in the event of default at the option of the holder. The payment terms of the Capital Note did not parallel those of the Standard Insurance Note, which provided for equal monthly payments of principal and interest at 11 percent per annum (with provision for a certain rate adjustment after five years) until the earlier of January 1, 1998, or the date on which the note has been paid in full.

On December 21, 1989, in advance of the above actions, the NAC Corporation board of directors (consisting of petitioner Donald J. Peracchi as the sole director) "acknowledged and accepted" as capital contributions the above-mentioned parcels of real property, and the Capital Note "to offset the difference between the allocated liability and the basis in the buildings located at 5118 E. Clinton Way [the Clinton Way Property]."

The following table reflects the computation of the net amount of petitioners' contribution to capital if the Capital Note is taken into account at face value:

| Item Contributed to Capital | Fair Market Value or Face Value | Encumbrance | Net Amount |
|---|---|---|---|
| Clinton Way Property | $1,870,000 | $1,386,654.50 | $483,345.50 |
| Fresno/Herndon Property | 1,200,000 | 161,558.28 | 1,038,441.80 |
| Capital Note | 1,060,000 | | 1,060,000.00 |
| Total | 4,130,000 | 1,548,212.78 | 2,581,787.30 |

Petitioners made no payments on the Capital Note during 1989, or at any time thereafter until March 15, 1992, when they made an interest payment of $233,200. The IRS audit of petitioners' 1989 income tax return had been under way for almost a year, having commenced during April, 1991.

In February, 1990, management of NALICO was advised by Ernst & Young, NALICO's independent certified public accountants, that under Chapter 9 of the National Association of Insurance Commissioner's Accounting Practices and Procedures Manual for Life and Accident and Health Insurance Companies (NAIC Manual),

the Capital Note would be classified as a "nonadmitted asset

because it was unsecured;" thus, it would not be treated as an

asset of NALICO for purposes of computing its capital-to-premium

ratio as of December 31, 1989.

The parties agree that the transactions under scrutiny

qualify under the nonrecognition provision of section 351, except

as that section may be limited by section 357(a) and (c)(1).

They also agree that section 357(b) is not applicable, but

disagree as to the application of sections 357(a) and 357(c)(1).

SEC. 357(a) provides:

> (a)  General Rule.--Except as provided in
> subsections (b) and (c), if--
>
>> (1)  the taxpayer receives property
>> which would be permitted to be received under
>> section 351, 361, 371, or 374, without the
>> recognition of gain if it were the sole
>> consideration, and
>>
>> (2)  as part of the consideration,
>> another party to the exchange assumes a
>> liability of the taxpayer, or acquires from
>> the taxpayer property subject to a liability,
>
> then such assumption or acquisition shall not be
> treated as money or other property, and shall not
> prevent the exchange from being within the provisions
> of section 351, 361, 371, or 374, as the case may be.

Section 357(c)(1) provides:

> (1) In General.--In the case of an exchange--
>> (A)  to which section 351
> applies, or

> (B) to which section 361 applies by reason of a plan of reorganization within the meaning of section 368(a)(1)(D),
>
> if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.

Thus, for present purposes, section 357(a) provides the general rule that, in a section 351 nonrecognition exchange, the effect of section 351 is not nullified even though as part of the consideration the transferee assumes a liability of the transferor, or acquires property in the exchange which is subject to a liability. Then, section 357(c)(1) provides an exception to the general rule; namely, that if the sum of the liabilities assumed plus the amount of the liabilities to which the transferred property is subject exceeds the adjusted basis of the property, then the excess is treated as a gain from the sale or exchange of property.

Respondent argues that, by virtue of section 357(c)(1), petitioners must recognize gain resulting from the transfer to their wholly owned corporation of property subject to liabilities in excess of petitioners' basis in the property.

Petitioners take the position that they did not realize (nor were they required to recognize) a gain when they transferred property, including their $1,060,000 Capital Note, to their wholly owned corporation, and that, for purposes of section 357(c), the adjusted basis of their Capital Note was its face amount and not zero. Petitioners reach these conclusions by a complicated route. They make the following arguments:

1. Since NAC Corporation acquired the 5118 Clinton Way buildings and improvements subject only to $326,654.50 of the unpaid principal balance of the Standard Insurance Note, an amount not in excess of the adjusted basis of the 5118 Clinton Way buildings and improvements, no gain should be recognized by petitioners under section 357(c).

In so doing, petitioners attempt to apply the rationale of the wraparound mortgage-installment sale line of cases, of which the progenitor is <u>Stonecrest Corp. v. Commissioner</u>, 24 T.C. 659 (1955); petitioners argue that NAC Corporation acquired the Clinton Way Property "subject to only $326,654.50 of the unpaid principal balance of the Standard Insurance Note (the $1,386,654.50 unpaid principal balance of the Standard Insurance Note, minus the $1,060,000 face amount of the Capital Note)," and that the sum of the Clinton Way and Fresno/Herndon liabilities, $488,212.78 ($326,654.50 plus $161,558.28), was thus less than the sum of the adjusted bases of the three properties,

$981,406.48. Thus, petitioners say, no gain is to be recognized under section 357(c)(1).

2. Since petitioners undertook genuine personal liability for the excess of the unpaid principal balance of the Standard Insurance Note over the adjusted basis in the 5118 Clinton Way buildings and improvements, no gain should be recognized by petitioners under section 357(c) of the Internal Revenue Code.

3. Under section 1012 of the Code, petitioners' basis in the Capital Note was $1,060,000, its face amount.

4. Alternatively, under section 1012 of the Internal Revenue Code, NAC Corporation's basis in the Capital Note was $1,060,000, its face amount.

All of petitioners' arguments presuppose that the Capital Note represents genuine indebtedness. Since we do not agree that it does, we need not address the various convoluted approaches petitioners ask us to take to arrive at the conclusion that they are not required to recognize gain under section 357(c). Nor need we address such nettlesome questions as whether a taxpayer's unsecured promissory note can ever constitute "property" for purposes of section 357(c)(1) and related Code sections, and whether such an instrument has a basis for purposes of section 1012, and, if so, the amount thereof. See Lessinger v. Commissioner, 872 F.2d 519 (2d Cir. 1989), revg. 85 T.C. 824 (1985), Alderman v. Commissioner, 55 T.C. 662 (1971).

Petitioners' own course of conduct belies their efforts to lead us to believe that on December 26, 1989, they placed a debt instrument in the hands of their 100-percent owned corporation that they actually intended to honor under all circumstances. Notwithstanding the fact that this case was submitted fully stipulated, petitioners nevertheless bear the burden of proving that they intended to and did create genuine indebtedness.  Rule 142(a); see Rule 122(b); Service Bolt & Nut Co. Trust v. Commissioner, 78 T.C. 812, 819 (1982), affd. 724 F.2d 519 (6th Cir. 1983).  This they have failed to do.

The parties stipulated that as of December 31, 1989, petitioners had a net worth far in excess of the $5,841,436 consolidated net worth of NAC Corporation, WSA, and NALICO.  It may therefore be presumed that, had they chosen to do so, petitioners could have funded the disputed excess of liabilities over basis by means other than an unsecured promissory note, which, as events transpired, cost them nothing in terms of cash layouts for over two years after their December 26, 1989, contribution of the Capital Note to NAC Corporation.

As previously stated, the Capital Note contained petitioners' unconditional promise to pay NAC Corporation interest at the rate of 11 percent per annum in monthly installments (presumably $9,716.67 monthly) commencing February 1, 1990, and continuing until January 1, 1995.  Despite the

"unconditional" nature of petitioners' obligation, however, they chose to make no payments whatsoever until March 15, 1992, when they made a lump sum interest payment of $232,200.  At the time of the payment, the IRS audit of petitioner's 1989 return had been underway for almost a year.  (The parties stipulated that petitioners' obligation had been made current by December 4, 1994, the day before the case was submitted.  We note, however, that since the Capital Note provides that no principal payments would be required until February 1, 1995, none were required to make the obligation current as of December 4, 1994.)

Notwithstanding the provision of the Capital Note providing for acceleration in the event of default at the option of the holder, there is no evidence suggesting that NAC Corporation chose to exercise this option.  Since petitioners did not intend to make timely payments on the Capital Note, it is not surprising that they did not see fit to cause NAC Corporation to exercise its option.  Petitioners, 100 percent stockholders, were totally in control of NAC Corporation.  Donald Peracchi was the sole director.  In cases involving closely held corporations, such as this case, where the parties do not deal at arm's length, it is highly unrealistic to expect them to enforce obligations against themselves, as petitioners' casual approach to their payment obligations bears out.  See Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 (5th Cir. 1974).

We have held on more than one occasion that in the closely held corporation context, loan repayments that commenced only after a taxpayer had notice of an IRS audit go far to weaken the payments as persuasive evidence of a preexisting intention of paying on schedule, or at all.  See, for example, Tollefsen v. Commissioner, 52 T.C. 671, 680 (1969), affd. 431 F.2d 511 (2d Cir. 1970); Piekos v. Commissioner T.C. Memo. 1982-602; Granzotto v. Commissioner, T.C. Memo. 1971-106; see also Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980) (repayment of taxpayer notes in stockholder control situation not made until after taxpayers were aware that their returns were to be audited, thus constituting a mere formalism of no great significance), affg. T.C. Memo. 1978-306.

Petitioners apparently wished to keep their commitments to their financially troubled consolidated group of corporations as ephemeral as possible.  Although Ernst & Young advised petitioners in February, 1990, that the Capital Note would be treated as a nonadmitted asset for purposes of computing NALICO's capital-to-premium ratio under State insurance company regulations, the record reflects no effort by petitioners to rectify the situation, although their very substantial net worth exclusive of their NAC Corporation holdings would make it seem probable that they could have done so.  From this, and from petitioners' and NAC Corporation's general indifference to

compliance with the terms of the Capital Note, it is reasonable to conclude that the Capital Note's only significance was to serve as a makeweight against the potential of recognition of gain under section 357(c).

We accordingly find that petitioners did not intend to pay the Capital Note according to its terms, and that therefore no genuine indebtedness was created.

It is noteworthy in this connection that the December 21, 1989, NAC Corporation board of directors' minutes makes no reference to any corporate acceptance of the Capital Note as assistance in the rectification of the twin problems of net worth and capital-to-premium ratio deficiencies. Rather, insofar as any corporate purpose is reflected by the minutes, the sole function of the Capital Note was to offset the difference between the "allocated liability and the basis" of the Clinton Way Property; i.e., to aid NAC Corporation's sole shareholder-- petitioners--in the avoidance of the recognition of gain under section 357(c)(1).

Petitioners suggest on brief (although they do not press the point very vigorously) that even if their liability under the Capital Note is not taken into consideration, their continuing liability under both the Standard Insurance and Bunn & Duran obligations avoids the requirement that they recognize gain under section 357(c)(1). This position, however, is inconsistent with

the decision of the U.S. Court of Appeals for the Ninth Circuit (the court to which this case would normally be appealed) in <u>Owen v. Commissioner</u>, 881 F.2d 832 (9th Cir. 1989), affg. T.C. Memo. 1987-375.

In <u>Owen</u>, taxpayer was an equal partner with McEachron in McO, a general partnership engaged in the seismic drilling business. In 1980, the partners borrowed money to buy drilling equipment, secured the loan by the equipment, gave their personal guaranties to the lender, and placed title to the equipment in McO. In 1981 the partnership transferred the equipment to the partners' wholly owned corporation, at which time the indebtedness secured by the assets exceeded the assets' adjusted basis. The Ninth Circuit affirmed our holding that section 357(c)(1) applied. The court held that "'So long as the transferred property remains liable on the debt, then, such debt can be a section 357(c) liability even if the * * * [taxpayer] retained personal, unrelieved liability on it.'" 881 F.2d at 835, quoting <u>Smith v. Commissioner</u>, 84 T.C. 889, 909 (1985), and citing additional decisions to the same effect.

In the case before us, the Standard Insurance Note was secured by the deed of trust encumbering the Clinton Way Property, and in the event of a default by NAC Corporation, Standard Insurance would unquestionably have looked in the first instance to the Clinton Way Property, the security under the

Standard Insurance Note, for satisfaction of the debt.  The same is true for the Bunn & Duran obligation.  The fact that petitioners remained liable on the Standard Insurance and Bunn & Duran debts does not alter their section 357(c) liability under the rationale of Owen.  For the above reasons, we hold that petitioners are required to recognize gain under section 357(c)(1), measured by the excess of the debt obligations secured by the three parcels of real property at the time of the transfer to NAC Corporation over petitioners' total adjusted basis in the property.

To reflect this holding,

Decision will be entered

for respondent.