HGA CINEMA TRUST, Burton W. Kanter, Trustee, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 90–2101.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1991.

Decided Dec. 27, 1991.

Burton W. Kanter (argued), Neal, Gerber & Eisenberg, Chicago, Ill., for petitioner-appellant.

Abraham N.M. Shashy, Jr., I.R.S., Gary R. Allen, David I. Pincus, Joan I. Oppenheimer (argued), Dept. of Justice, Tax Div., Appellate Section, Charles S. Casazza, U.S. Tax Court, Washington, D.C., for respondent-appellee.

**1358**

Before BAUER, Chief Judge, and COFFEY and MANION, Circuit Judges.

BAUER, Chief Judge.

In this appeal, we must decide whether a partnership's long-term promissory notes represent valid debt. The United States Tax Court held that these notes were not valid indebtedness. We affirm.

## I.

The pertinent facts of this case have been set forth ably by the United States Tax Court. *See HGA Cinema Trust, Burton Kanter, Trustee v. Commissioner of Internal Revenue,* 57 T.C.M. (CCH) 1066 (1989). Here, we need only recite those facts essential to our decision. Petitioner-appellant HGA Cinema Trust ("HGA"), whose trustee is tax attorney Burton W. Kanter, held a 5.56 percent interest in the profits and losses of a limited partnership called SLG during each of the taxable years 1978 through 1981. The tax deficiencies that are the subject of this appeal arose from the sale of computer equipment to SLG and its leaseback of this equipment.

The principal corporate participants in the transactions at issue are O.P.M. Leasing Services, Inc. ("O.P.M."), Funding Systems Leasing Corporation ("Funding"), Pluto Leasing Corporation ("Pluto"), and Knight Leasing Corporation ("Knight"). O.P.M. and Funding (the "leasing corporations") were engaged in the equipment leasing business. The leasing corporations purchased certain computer and peripheral equipment from end users and then leased that equipment back to the end users. To finance part of the purchase price, each leasing corporation obtained a nonrecourse loan from an institutional lender, secured by a lien on the equipment and an assignment of the rentals payable under the end users' leases. These transactions among the leasing corporations, the lenders, and the end users, were valid multiparty transactions that had economic substance.

On June 30, 1978, Funding and O.P.M. entered into several agreements with Pluto and Knight (the "intermediary corporations") involving the sale and leaseback of certain computer equipment. On the same date, the intermediary corporations sold this equipment to SLG, and SLG assumed the intermediary corporations' rights and obligations under their leaseback agreements to Funding and O.P.M. To understand the facts underlying this appeal, we must describe these rather complex transactions in greater detail.

### The Funding–Pluto–SLG Transactions

Funding agreed to sell the leased equipment to Pluto subject to the lender's lien and rights under the lease of end user. Pluto purchased the equipment for $2,700,-000, payable as follows: $5,000 in cash, $25,000 by noninterest-bearing promissory note due on July 31, 1978, and $2,670,000 by a limited recourse promissory note that was to be paid in 96 monthly installments with a 10.4 percent annual interest rate.

On the same date, June 30, 1978, Pluto agreed to lease the computer equipment back to Funding for a term extending through June 30, 1986. In addition to the terms of the rent, the lease agreement provided that "[Funding] will indemnify [Pluto] and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense ... which [Pluto] may incur by reason of any breach by [Funding] of any of the representations by, or obligations of, [Funding] contained in this Lease...." Funding and Pluto also executed a remarketing agreement in which Funding agreed to remarket the computer equipment after the termination of Pluto's lease, and Pluto agreed to pay Funding ten percent of all proceeds from the remarketing agreement.

On the same date, SLG purchased from Pluto the computer equipment that Pluto had acquired from, and leased back to, Funding. Pluto assigned its rights and interests in the equipment and in the lease to SLG, subject to the prior lien of the lenders, the rights of the end users, and the rights of Funding pursuant to its leasing agreement with Pluto. SLG assumed all of Pluto's obligations arising out of its purchase, leasing, and remarketing agreements with Funding. SLG did not assume

Pluto's long-term note or short-term recourse notes. SLG purchased the equipment from Pluto for $2,705,000—$5,000 more than Pluto paid to Funding for the equipment. The terms of payment, however, were almost identical: $5,000 in cash, $25,000 by negotiable promissory note due on July 31, 1978, and $2,670,000 by long-term promissory note containing the same terms as Pluto's long-term note to Funding. The additional $5,000 was to be paid by a $5,000 negotiable promissory note due on March 31, 1979. SLG anticipated the cash flow generated by these transactions to be $200 per month, which represents the difference between the rent due on the lease between Funding and Pluto, and the monthly payments that SLG was obligated to pay on the long-term note to Pluto.

The long-term note between SLG and Pluto contained the following provisions:

5.2 *Deferral.* In the event the Lease is terminated prior to the expiration of the Lease term, on account of an Event of Default as defined thereunder, then, notwithstanding anything herein to the contrary, the entire unpaid principal amount of this Note, together with all interest accruing hereunder shall be deferred and shall not be due and payable until June 30, 1993, at which time all such unpaid principal and accrued interest shall become due and payable; provided, however, that notwithstanding such deferral to the extent Payor shall receive any proceeds from the Equipment following a termination of the Lease as aforesaid, it shall be obligated to pay such proceeds to the Senior Lienholder on account of the Debts (and such payment shall be deemed to prepayments under this Note).

5.3 *Extension, Set-Off and Discharge.* Debtor shall have, in addition to all other rights and remedies it may have, the right to defer payment of (but not reduce the amount of) each and every payment of principal and interest as the same becomes due hereunder if and to the extent any amount of rent or other sum becoming due to Debtor under the Lease is not paid by Funding as the same becomes due (the "Past Due Sum"). The

amount of principal and interest so deferred will become due and payable at such time as, and to the extent that, Funding pays to Debtor such Past Due Sum; provided, however, that no interest shall accrue on the principal and interest payments so deferred. Any Past Due Sum remaining due to Debtor at the expiration or sooner termination of the Lease will serve to reduce the unpaid principal and interest on this Note at that time.

### The O.P.M.–Knight–SLG Transactions

On June 30, 1978, O.P.M., Knight, and SLG entered into a series of transactions not materially different from the Funding–Pluto–SLG transactions, for the sale and leaseback of a 45 percent interest in certain used computer equipment. The format was essentially the same: Knight conveyed to SLG a 45 percent interest in the equipment that was the subject of the sale and leaseback between O.P.M. and Knight. Specifically, O.P.M. agreed to sell certain computer equipment to Knight, subject to the lien of the lender and the rights of the user. The purchase price was $5,005,655, payable as $25,000 in cash, $25,000 by negotiable, noninterest-bearing promissory note due July 31, 1978, and $4,955,655 by limited recourse promissory note. This limited recourse note was payable in 96 monthly installments with a 10.2 percent annual rate of interest.

Knight leased the equipment back to O.P.M. on the same day, June 30, 1978, for a term extending through June 30, 1986. The Knight–O.P.M. lease contained an indemnification clause identical to that contained in the Funding–Pluto lease. Knight and O.P.M. also entered into a remarketing agreement for the period following the expiration of the lease. Pursuant to the remarketing agreement, Knight agreed to pay O.P.M. ten percent of all net proceeds from remarketing.

On June 30, 1978, SLG agreed to purchase from Knight a 45 percent interest in the equipment for $2,257,045, payable as follows: $11,250 in cash, a non-interest bearing note for $11,250 due July 31, 1978, a non-interest bearing note for $4,500 due

March 31, 1979, and a long-term recourse note for $2,230,045. The cash payment, the $11,250 note, and the long-term note are exactly 45 percent of the corresponding terms from Knight to O.P.M., and the payment terms on SLG's long-term note were exactly 45 percent of the corresponding terms of Knight's long-term note to O.P.M. The long-term note contained provisions identical to those in SLG's note to Pluto.

As was the case with the Funding–Pluto–SLG transactions, Knight assigned all its rights and interests in the equipment and lease to SLG, and SLG assumed all of Knight's obligations under its agreements with O.P.M., except for Knight's debt obligations to O.P.M. SLG anticipated that its transactions with O.P.M. and Knight would generate a monthly cash flow of $160. This sum represented the excess of the rental payments from the Knight–O.P.M. lease over SLG's monthly payments on its long-term note.

### The Bankruptcies

O.P.M. and Funding filed bankruptcy petitions under Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 1–1330 (1988), on March 11, 1981, and October 23, 1981, respectively. In the course of the proceedings, SLG, Pluto, and Funding agreed to an assumption, modification, and compromise of controversies with respect to the sale and leaseback transactions. SLG, Knight, and O.P.M. entered into similar agreements. The bankruptcy court approved the modifications.

These agreements provided that SLG's cash flow of $200 and $160 per month, including amounts past due and amounts not yet due, would become unsecured general claims against Funding and O.P.M., respectively. Funding's and O.P.M.'s lease payments were reduced to eliminate the net cash flow to SLG. As a result, the lease payments from Funding to SLG, the note payments from SLG to Pluto, and the note payments from Pluto to Funding were of equal amounts. Similarly, the lease and note payments between O.P.M., SLG, and Knight were of equal amounts. The modifications also provided that the rent and

note payments were to offset each other and the order in which the rental and note payments were due was reversed.

### SLG, HGA, and the Proceedings Below

On June 30, 1978, SLG expected the equipment to have a residual value at the end of the leasebacks on June 30, 1986, of at least seven percent, net of marketing fees and other expenses. SLG expected the residual value to decline to near zero by June 30, 1993, the deferral date in the long-term notes.

The parties stipulated that the transactions had economic substance and that SLG had a profit motive in entering into the transactions with Pluto and Knight. SLG, therefore, acquired a depreciable interest in the equipment on June 30, 1978. SLG used $4,962,000.45 as its basis in the equipment in computing its depreciation deductions on its federal income tax returns. This amount represented the total cost of the equipment it purchased, including the face value of the long-term notes.

SLG received $3,600 from Pluto and $2,280 from Knight on or shortly after February 28, 1980. These amounts represented the monthly cash flow from the transactions for the 18–month period from July 1978 through December 1979. SLG reported rental income, depreciation, and interest expense from the sale leaseback transactions in 1979, 1980, and 1981 as follows:

| | 1979 | 1980 | 1981 |
|---|---|---|---|
| Rental Income | $480,366 | $1,044,022 | $1,041,862 |
| Depreciation | (827,077) | (827,007) | (827,007) |
| Interest Expense | (640,532) | (479,255) | (418,905) |

HGA, as a partner in SLG, reported and deducted its distributive share of the partnership's losses and investment interest expense for the years in issue on its federal returns as follows:

| | 1979 | 1980 | 1981 |
|---|---|---|---|
| Income (loss) | ($19,074) | $11,926 | $11,747 |
| Interest Expense | (8,706) | (12,525) | (11,919) |

The Commissioner of Internal Revenue ("Commissioner") sent HGA a notice of deficiency for the tax years 1978 through 1980 and for tax year 1981 which, among other things, disallowed all income and deductions from the sale-leaseback transactions and imposed additional interest and

various penalties under the Internal Revenue Code.

HGA filed petitions for redetermination of the deficiencies with the United States Tax Court, and the actions were consolidated. In his amended answers, the Commissioner asserted that the long-term promissory notes given by SLG to Knight and Pluto did not constitute valid indebtedness. HGA disagreed and argued that the notes could be enforced if the leasing corporations declared bankruptcy and the trustees in bankruptcy rejected the underlying leases. The Commissioner responded that even if the SLG notes represent valid indebtedness, HGA was not "at risk" within the meaning of section 465 of the Internal Revenue Code (the "Code"), 26 U.S.C. §§ 1–9602 (1988), for the principal of these notes. Section 465 generally provides that a taxpayer may deduct a loss from an activity only to the extent of the amount he has "at risk" in the activity, such as cash or property contributed to the endeavor, as well as amounts borrowed for which the taxpayer is personally liable for repayment.

The Tax Court sustained the Commissioner's disallowance of HGA's losses and deductions attributable to SLG on the ground that SLG's long-term notes did not represent genuine indebtedness. It relied on the discharge, deferral, and indemnification clauses. Under the discharge clause, SLG's obligation to make note payments was in essence subject to the leasing corporations' obligation first to pay rent. Under the deferral clause, note payments were deferred until June 30, 1993, if the leasing corporations defaulted and their leases were terminated. On that date, the equipment would be worthless and the leasing corporations' and intermediary corporations' nonrecourse notes could be satisfied by surrendering the worthless equipment. Thus, they could not recover from SLG. Finally, although SLG's notes purported to be recourse notes, any rent not realized by SLG due to a leasing corporation's default on a lease was a loss or damage subject to indemnification pursuant to the lease. Thus, the Tax Court found that SLG's note payments, were, in effect, payable solely out of rental receipts.

The Tax Court rejected HGA's argument that there was genuine indebtedness because a trustee in bankruptcy could reject the leases. It considered "implausible" the argument that SLG entered these transactions expecting the leasing corporations to declare bankruptcy, and it pointed out that the evidence suggested that bankruptcy was not likely in 1978, 1979, or 1980. Furthermore, the trustee-in-bankruptcy and debtor-in-possession for O.P.M. and Funding did not, in fact, reject the leases or attempt to collect on SLG's notes when the corporations did in fact declare bankruptcy. On the contrary, the modifications of the notes, approved by the bankruptcy court, simply continued the circularity of the offsetting rent and debt obligations. Finally, the Tax Court observed that, had the leases been rejected, SLG had substantial legal arguments that the notes were *not* recourse but that the obligations on the notes were wholly dependent on realizing rentals under the lease agreement.

The Tax Court sustained the Commissioner's imposition of additional interest under the section 6621(c)(3)(A)(ii) of the Code, which imposes interest of 120 percent of the applicable rate on tax underpayments exceeding $1,000, if the underpayments are attributable to any loss disallowed by reason of section 465(a). It relied on Code section 465(b)(2)(A), which provides that a taxpayer is at risk with respect to amounts borrowed for use in an activity to the extent that he is personally liable for repayment of such amounts. Because the notes did not represent valid indebtedness, they were not amounts borrowed for which HGA was personally liable for repayment. Thus, the loss in question was disallowed by reason of section 465(a), and HGA was liable for additional interest.

The Tax Court also sustained the imposition of additions to tax pursuant to Code section 6651(a)(1) (failure to file timely return) and section 6653(a) (negligence). Relying on *United States v. Boyle*, 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985), the court held that the reliance placed by Kanter, a tax attorney, on a clerical employee to file the trust's return does not

constitute reasonable cause for its untimely filing of its 1979 return. HGA appealed from the Tax Court's decision.

## II.

[1] HGA, as noted above, was a partner in SLG. Under section 704(d) of the Code, a partner's distributive share of a partnership loss is allowed only to the extent of the adjusted basis of his interest in the partnership at the end of year in which the loss occurred. As a general rule, any increase in a partner's share of the partnership's liabilities is considered a contribution of money to the partnership, and increases a partner's basis in the partnership. *See* Internal Revenue Code, §§ 705(a), 722, 752(a). *See also* Arthur B. Willis, *Partnership Taxation* § 52.05 (4th ed. 1991). Nevertheless, for HGA's proportionate share of the partnership's debt to be included in its basis, the debt must be genuine. Thus, the sole issue before us is whether SLG's long-term promissory notes constituted a valid and binding indebtedness.

■ HGA argues that the Tax Court's decision that SLG's long-term promissory notes did not represent valid debt is erroneous and should be reversed. We are not persuaded. Genuine indebtedness consists of "the unconditional and legally enforceable obligation for the payment of money." *Autenreith v. Commissioner*, 115 F.2d 856, 858 (3d Cir.1940). Contingent or speculative obligations do not represent valid indebtedness and cannot be included in a taxpayer's basis. *See Durkin v. Commissioner of Internal Revenue*, 872 F.2d 1271, 1276 (7th Cir.) ("When ... the debt used to purchase an asset is unlikely to be paid by the taxpayer, that debt does not represent a bona fide capital investment by the taxpayer and will be excluded from the depreciable basis of the asset."), *cert. denied*, 493 U.S. 824, 110 S.Ct. 84, 107 L.Ed.2d 50 (1989). *See also Lewis v. Commissioner of Internal Revenue*, 328 F.2d 634, 635 (7th Cir.) ("Regardless of a taxpayer's motives, where a paper transaction lacks substance and no genuine indebtedness is created ... no interest can be said to have been paid for the use or forbearance of money actually loaned and no interest expense deduction may flow therefrom."), *cert. denied*, 379 U.S. 821, 85 S.Ct. 43, 13 L.Ed.2d 32 (1964).

■ In the instant case, the Tax Court correctly held that SLG's obligation to make payments on the long-term notes was not an unconditional obligation but instead was subject to the leasing corporations' promise to pay the rent due. Indeed, the language of the long-term notes from SLG to the intermediary corporations provided that SLG had "the right to defer payment of ... principal and interest as the same becomes due hereunder if and to the extent any amount of rent or other sum becoming due to [SLG] under the Lease is not paid by ... [the lessee] as the same becomes due." The note payment deferred in this manner became due only when, and to the extent that, the lessee paid the past due rent. In other words, under the terms of long-term notes, SLG had no obligation to "pay" on the notes except to the extent that Funding or O.P.M. paid rent.

The deferral clause further demonstrates that the indebtedness was not genuine. If a lease was terminated as a result of an event of default, such as the filing of a bankruptcy petition, SLG's obligation on its note was deferred for fifteen years from the date of execution of the note—until June 30, 1993. On that date, the parties expected the equipment to have virtually no value. The leasing corporations' and the intermediary corporations' nonrecourse liabilities, then, could be satisfied by forfeiting the nearly worthless equipment. Although SLG's notes are labelled "recourse," it is unlikely that the intermediary corporations would be able to enforce them because they would be in no different financial situation than when the offsetting rent and note payments were being made. *See Moser v. Commissioner of Internal Revenue*, 914 F.2d 1040, 1048–49 (8th Cir. 1990) ("[I]n deciding whether the Strothmans ... were not at risk on the portions of their recourse notes, we inquire whether the arrangement removed any realistic possibility that they would suffer an economic loss if the underlying transaction turned

unprofitable. Economic reality is our guide.... [T]he circular nature of the arrangement ... effectively immunized the Strothmans from economic loss.")

Moreover, in the leases, the leasing corporation agreed to indemnify and hold harmless the intermediary corporations from "any and all loss, cost, damage, injury, or expense ... which Lessor ... may incur by reason of any breach by Lessee of any of the representations by, or obligations of, Lessee contained in this Lease...." By the plain language of this provision, the indemnity encompasses not only the obligation to maintain the tangible property, as HGA contends, but also the obligation to pay rent. Because SLG was the assignee of the intermediary corporations' rights of indemnity, it could respond to any suit on the notes by seeking indemnity from the leasing corporations. Thus, the structure of the relationships between SLG and the various leasing and intermediary corporations indicates that the notes do not, in fact, constitute genuine indebtedness.

Nevertheless, HGA maintains that the long-term notes represented valid indebtedness because of the potential effects of a bankruptcy. HGA argues that, if the leasing corporations went bankrupt, their trustees-in-bankruptcy would have the legal right to reject the leases. This rejection, according to HGA, would eliminate the rental offset referred to in paragraph 5.3 of the long-term notes because prepetition rental obligations cannot be offset against post-petition note obligations. Appellant's Brief at 10–11. Under this theory, SLG would have no right to offset the note payments with the unpaid rentals and would be subject to claims for collection of the notes. In HGA's view, SLG would then be liable (thus proving the genuineness of the debts) on the notes and have only a claim as a general creditor against the bankrupt estate.

The Tax Court considered this argument and, as we hold, properly rejected it. The Tax Court refused to accept the implausible argument that SLG entered into these transactions with a view that the leasing

corporations would declare bankruptcy. We agree. As the Tax Court found, there is no evidence to suggest that bankruptcy was a realistic or anticipated event when the parties structured their relationships. Moreover, as the Tax Court noted, the actual consequences of the bankruptcies in 1981 support the holding that the long-term notes did not represent genuine indebtedness. The trustee-in-bankruptcy and the debtor-in-possession did not reject the lease and attempt to collect on SLG's notes. Instead, SLG, the intermediary corporations, and the leasing corporations agreed to modify the long-term notes: SLG's cash flow was eliminated, the rental payments were made equal to the note payments, and the priority of the payments was reversed so that the note payments would be credited prior to the leasing corporations' rental payments. Yet SLG retained the offset and deferral rights contained in the original notes. Thus, as the Tax Court properly determined, even with the modifications, the closed circularity of the offsetting rent and debt obligations persisted—the change was in form only: with the modifications, the rent was to be subtracted from the debt; previously, the debt had been subtracted from the rent. Consequently, the potential effects of bankruptcy cannot transform HGA's "obligations" into genuine indebtedness. Because these notes did not represent valid debt, they can neither be included in basis nor support a deduction for interest expense. *Knetsch v. United States,* 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960).

 HGA's remaining claims merit far less attention. Suffice it to say that the Tax Court properly held that an addition to tax pursuant to section 6651(a)(1) of the Code was warranted by HGA's failure to file its federal return on time and because the transactions were tax-motivated. HGA's trustee, a tax attorney, cannot escape the provisions of section 6651 by blaming an employee for that employee's failure to follow the trustee's directions. It is well-settled that a taxpayer has a personal, nondelegable duty to file the return when due, and reliance on an agent cannot constitute reasonable cause to ex-

cuse the taxpayer's failure to file on time. *Boyle*, 469 U.S. at 247, 105 S.Ct. at 690. HGA's contention that the employee deceived the trustee about whether the return was filed does not alter the trustee's duty to see that the return was filed on time.

██ Similarly, the additional interest imposed on underpayments attributable to tax-motivated transactions pursuant to section 6621(c)(3)(A)(ii) also was warranted. As the Tax Court determined, the language of section 6621 includes losses disallowed by reason of invalid debt. Because HGA's losses arise out of long-term notes that do not represent genuine indebtedness, they are disallowed. Thus, we agree with the Tax Court that additional interest pursuant to section 6621(c) is proper.

For the foregoing reasons, the decision of the Tax Court is

AFFIRMED.