Donald J. PERACCHI; Judith E. Peracchi, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 96–70606.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 17, 1997.

Decided April 29, 1998.

---

Craig A. Houghton, Baker, Manock & Jensen, Fresno, California, for the petitioners-appellants.

Bruce Ellisen, Tax Division, United States Department of Justice, Washington, DC, for the respondent-appellee.

Before: MAYER,* Chief Judge, KOZINSKI and FERNANDEZ, Circuit Judges.

Opinion by Judge KOZINSKI; Dissent by Judge FERNANDEZ.

KOZINSKI, Circuit Judge:

We must unscramble a Rubik's Cube of corporate tax law to determine the basis of a note contributed by a taxpayer to his wholly-owned corporation.

## The Transaction

The taxpayer, Donald Peracchi,[1] needed to contribute additional capital to his closely-held corporation (NAC) to comply with Nevada's minimum premium-to-asset ratio for insurance companies. Peracchi contributed two parcels of real estate. The parcels were encumbered with liabilities which together exceeded Peracchi's total basis in the properties by more than half a million dollars. As we discuss in detail below, under section 357(c), contributing property with liabilities in excess of basis can trigger immediate rec-

---

* The Honorable H. Robert Mayer, Chief Judge, United States Court of Appeals for the Federal Circuit, sitting by designation.

1. Judith Peracchi, Donald's wife, filed a joint return with her husband, so her liability turns on the outcome of his appeal. For convenience, we will refer to the taxpayers simply as "Peracchi."

ognition of gain in the amount of the excess. In an effort to avoid this, Peracchi also executed a promissory note, promising to pay NAC $1,060,000 over a term of ten years at 11% interest. Peracchi maintains that the note has a basis equal to its face amount, thereby making his total basis in the property contributed greater than the total liabilities. If this is so, he will have extracted himself from the quicksand of section 357(c) and owe no immediate tax on the transfer of property to NAC. The IRS, though, maintains that (1) the note is not genuine indebtedness and should be treated as an unenforceable gift; and (2) even if the note is genuine, it does not increase Peracchi's basis in the property contributed.

The parties are not splitting hairs: Peracchi claims the basis of the note is $1,060,000, its face value, while the IRS argues that the note has a basis of zero. If Peracchi is right, he pays no immediate tax on the half a million dollars by which the debts on the land he contributed exceed his basis in the land; if the IRS is right, the note becomes irrelevant for tax purposes and Peracchi must recognize an immediate gain on the half million. The fact that the IRS and Peracchi are so far apart suggests they are looking at the transaction through different colored lenses. To figure out whether Peracchi's lens is rose-tinted or clear, it is useful to take a guided tour of sections 351 and 357 and the tax law principles undergirding them.

## Into the Lobster Pot: Section 351 [2]

The Code tries to make organizing a corporation pain-free from a tax point of view. A capital contribution is, in tax lingo, a "non-recognition" event: A shareholder can generally contribute capital without recognizing gain on the exchange.[3] It's merely a change in the form of ownership, like moving a billfold from one pocket to another. See I.R.C. § 351.[4] So long as the shareholders contributing the property remain in control [5] of the corporation after the exchange, section 351 applies: It doesn't matter if the capital contribution occurs at the creation of the corporation or if—as here—the company is already up and running. The baseline is that Peracchi may contribute property to NAC without recognizing gain on the exchange.

## Gain Deferral: Section 358(a)

■ Peracchi contributed capital to NAC in the form of real property and a promissory note. Corporations may be funded with any kind of asset, such as equipment, real estate, intellectual property, contracts, leaseholds, securities or letters of credit. The tax consequences can get a little complicated because a shareholder's basis in the property

**2.** "Decisions to embrace the corporate form of organization should be carefully considered, since a corporation is like a lobster pot: easy to enter, difficult to live in, and painful to get out of." Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 2.01[3] (6th ed. 1997) (footnotes omitted) (hereinafter Bittker & Eustice).

**3.** The income tax often operates as a tax on transactions. Regardless of when a taxpayer realizes accretions to his economic wealth, income is usually recognized when a measuring event occurs, such as receipt of a paycheck or the "sale or exchange" of property. But the Code exempts certain sales and exchanges from recognition, such as when a sale is involuntary, or merely a change in the form of ownership, or otherwise warrants nonrecognition. See generally Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts ¶ 44.1.1 (2d ed. 1990) ("The Code contains numerous nonrecognition provisions covering a wide range of transactions that have little in common except that they have elicited a legislative judgment that the taxpayer's

realized gain or loss should not be taxed or deducted when the exchange or other event occurs."). Congress has not deemed the organization of a corporation an appropriate event for recognition of income.

**4.** Section 351(a) provides: "No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control . . . of the corporation."

**5.** Section 368(c) defines control as "ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation." The control requirement is designed to ensure continuity of ownership over the assets contributed: The nonrecognition rationale animating section 351 works only so long as the property contributed is, in substance, owned by the same persons before and after the exchange.

contributed often differs from its fair market value. The general rule is that an asset's basis is equal to its "cost." *See* I.R.C. § 1012. But when a shareholder like Peracchi contributes property to a corporation in a nonrecognition transaction, a cost basis does not preserve the unrecognized gain. Rather than take a basis equal to the fair market value of the property exchanged, the shareholder must substitute the basis of that property for what would otherwise be the cost basis of the stock.[6] This preserves the gain for recognition at a later day: The gain is built into the shareholder's new basis in the stock, and he will recognize income when he disposes of the stock.

The fact that gain is deferred rather than extinguished doesn't diminish the importance of questions relating to basis and the timing of recognition. In tax, as in comedy, timing matters. Most taxpayers would much prefer to pay tax on contributed property years later—when they sell their stock—rather than when they contribute the property.[7] Thus what Peracchi is seeking here is gain deferral: He wants the gain to be recognized only when he disposes of some or all of his stock.

### Continuity of Investment: Boot and section 351(b)

Continuity of investment is the cornerstone of nonrecognition under section 351. Nonrecognition assumes that a capital contribution amounts to nothing more than a nominal change in the form of ownership; in substance the shareholder's investment in the property continues. But a capital contribution can sometimes allow a shareholder to partially terminate his investment in an asset or group of assets. For example, when a shareholder receives cash or other property in addition to stock, receipt of that property reflects a partial termination of investment in the business. The shareholder may invest that money in a wholly unrelated business, or

spend it just like any other form of personal income. To the extent a section 351 transaction resembles an ordinary sale, the nonrecognition rationale falls apart.

Thus the central exception to nonrecognition for section 351 transactions comes into play when the taxpayer receives "boot"—money or property other than stock in the corporation—in exchange for the property contributed. *See* I.R.C. § 351(b). Boot is recognized as taxable income because it represents a partial cashing out. It's as if the taxpayer contributed part of the property to the corporation in exchange for stock, and sold part of the property for cash. Only the part exchanged for stock represents a continuation of investment; the part sold for cash is properly recognized as yielding income, just as if the taxpayer had sold the property to a third party.

Peracchi did not receive boot in return for the property he contributed. But that doesn't end the inquiry: We must consider whether Peracchi has cashed out in some other way which would warrant treating part of the transaction as taxable boot.

### Assumption of Liabilities: Section 357(a)

The property Peracchi contributed to NAC was encumbered by liabilities. Contribution of leveraged property makes things trickier from a tax perspective. When a shareholder contributes property encumbered by debt, the corporation usually assumes the debt. And the Code normally treats discharging a liability the same as receiving money: The taxpayer improves his economic position by the same amount either way. *See* I.R.C. § 61(a)(12). NAC's assumption of the liabilities attached to Peracchi's property therefore could theoretically be viewed as the receipt of money, which would be taxable boot. *See United States v. Hendler*, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018 (1938).

---

**6.** *See* I.R.C. § 358(a) ("The basis of the property permitted to be received ... without the recognition of gain or loss shall be the same as that of the property exchanged...."). For example, if a shareholder contributes depreciated property with a fair market value of $100 and a basis of $50, he takes a substitute basis of $50 in the stock he receives from the corporation.

**7.** Of course, should the taxpayers be lucky enough to die before disposing of the stock, their heirs would take a stepped-up basis in the stock equal to its fair market value as of the date of death. *See* I.R.C. § 1014.

The Code takes a different tack. Requiring shareholders like Peracchi to recognize gain any time a corporation assumes a liability in connection .with a capital contribution would greatly diminish the nonrecognition benefit section 351 is meant to confer. Section 357(a) thus takes a lenient view of the assumption of liability: A shareholder engaging in a section 351 transaction does not have to treat the assumption of liability as boot, even if the corporation assumes his obligation to pay. See I.R.C. § 357(a).

This nonrecognition does not mean that the potential gain disappears. Once again, the basis provisions kick in to reflect the transfer of gain from the shareholder to the corporation: The shareholder's substitute basis in the stock received is decreased by the amount of the liability assumed by the corporation. See I.R.C. § 358(d), (a). The adjustment preserves the gain for recognition when the shareholder sells his stock in the company, since his taxable gain will be the difference between the (new lower) basis and the sale price of the stock.

### Sasquatch and The Negative Basis Problem: Section 357(c)

Highly leveraged property presents a peculiar problem in the section 351 context. Suppose a shareholder organizes a corporation and contributes as its only asset a building with a basis of $50, a fair market value of $100, and mortgage debt of $90. Section 351 says that the shareholder does not recognize any gain on the transaction. Under section 358, the shareholder takes a substitute basis of $50 in the stock, then adjusts it downward under section 357 by $90 to reflect the assumption of liability. This leaves him with a basis of minus $40. A negative basis properly preserves the gain built into the property: If the shareholder turns around and sells the stock the next day for $10 (the difference between the fair market value and the debt), he would face $50 in gain, the same amount

as if he sold the property without first encasing it in a corporate shell.[8]

But skeptics say that negative basis, like Bigfoot, doesn't exist. Compare Easson v. Commissioner, 33 T.C. 963, 970, 1960 WL 1347 (1960) (there's no such thing as a negative basis) with Easson v. Commissioner, 294 F.2d 653, 657–58 (9th Cir.1961) (yes, Virginia, there is a negative basis). Basis normally operates as a cost recovery system: Depreciation deductions reduce basis, and when basis hits zero, the property cannot be depreciated farther. At a more basic level, it seems incongruous to attribute a negative value to a figure that normally represents one's investment in an asset. Some commentators nevertheless . argue that when basis operates merely to measure potential gain (as it does here), allowing negative basis may be perfectly appropriate and consistent with the tax policy underlying nonrecognition transactions. See, e.g., J. Clifton Fleming, Jr., The Highly Avoidable Section 357(c): A Case Study in Traps for the Unwary and Some Positive Thoughts About Negative Basis, 16 J. Corp. L. 1, 27–30 (1990). Whatever the merits of this debate, it seems that section 357(c) was enacted to eliminate the possibility of negative basis. See George Cooper, Negative Basis, 75 Harv. L.Rev. 1352, 1360 (1962).

Section 357(c) prevents negative basis by forcing a shareholder to recognize gain to the extent liabilities exceed basis.[9] Thus, if a shareholder contributes a building with a basis of $50 and liabilities of $90, he does .not receive stock with a basis of minus $40. Instead, he takes a basis of zero and must recognize a $40 gain.

Peracchi sought to contribute two parcels of real property to NAC in a section 351 transaction. Standing alone the contribution would have run afoul of section 357(c): The property he wanted to contribute had liabilities in excess of basis, and Peracchi would

---

8. If the taxpayer sells the property outright, his amount realized includes the full amount of the mortgage debt, see Crane v. Commissioner, 331 U.S. 1, 14, 67 S.Ct. 1047, 1054–55, 91 L.Ed. 1301 (1947), and the result is as follows: Amount realized ($10 cash + $90 debt) - $50 Basis = $50 gain.

9. Section 357(c) provides that gain shall be recognized if "the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange. . . ."

have had to recognize gain to the extent of the excess, or $566,807:[10]

| | Liabilities | Basis |
|---|---|---|
| Property # 1 | 1,386,655 | 349,774 |
| Property # 2 | 161,558 | 631,632 |
| | 1,548,213 | 981,406 |
| Liabilities | 1,548,213 | |
| Basis | 981,406 | |
| Excess (357(c)) | 566,807 | |

### The Grift: Boosting Basis with a Promissory Note

Peracchi tried to dig himself out of this tax hole by contributing a personal note with a face amount of $1,060,000 along with the real property. Peracchi maintains that the note has a basis in his hands equal to its face value. If he's right, we must add the basis of the note to the basis of the real property. Taken together, the aggregate basis in the property contributed would exceed the aggregate liabilities:

| | Liabilities | Basis |
|---|---|---|
| Property # 1 | 1,386,655 | 349,774 |
| Property # 2 | 161,558 | 631,632 |
| Note | 0 | 1,060,000 |
| | 1,548,213 | 2,041,406 |

Under Peracchi's theory, then, the aggregate liabilities no longer exceed the aggregate basis, and section 357(c) no longer triggers any gain. The government argues, however, that the note has a zero basis. If so, the note would not affect the tax consequences of the transaction, and Peracchi's $566,807 in gain would be taxable immediately.[11]

### Are Promises Truly Free?

Which brings us (phew!) to the issue before us: Does Peracchi's note have a basis in Peracchi's hands for purposes of section 357(c)?[12] The language of the Code gives us little to work with. The logical place to start is with the definition of basis. Section 1012 provides that "[t]he basis of property shall be the cost of such property...." But "cost" is nowhere defined. What does it cost Peracchi to write the note and contribute it to his corporation? The IRS argues tersely that the "taxpayers in the instant case incurred no cost in issuing their own note to NAC, so their basis in the note was zero." Brief for Appellee at 41. See Alderman v. Commissioner, 55 T.C. 662, 665, 1971 WL 2488 (1971); Rev. Rul. 68-629, 1968-2 C.B. 154, 155.[13] Building on this premise, the IRS makes Peracchi out to be a grifter: He holds an unenforceable promise to pay himself money, since the corporation will not collect on it unless he says so.

It's true that all Peracchi did was make out a promise to pay on a piece of paper, mark it in the corporate minutes and enter it on the corporate books. It is also true that nothing will cause the corporation to enforce the note against Peracchi so long as Peracchi remains in control. But the IRS ignores the possibility that NAC may go bankrupt, an event that

---

**10.** Peracchi remained personally liable on the debts encumbering the property transferred to NAC. NAC took the property subject to the debts, however, which is enough to trigger gain under the plain language of section 357(c). See Owen v. Commissioner, 881 F.2d 832, 835–36 (9th Cir. 1989).

**11.** The government does not dispute that the note and the two parcels of real estate were contributed as part of the same transaction for purposes of section 351. Their bases must therefore be aggregated for purposes of section 357(c).

**12.** Peracchi owned all the voting stock of NAC both before and after the exchange, so the control requirement of section 351 is satisfied. Peracchi received no boot (such as cash or securities) which would qualify as "money or other property" and trigger recognition under 351(b) alone. Peracchi did not receive any stock in return for the property contributed, so it could be argued that the exchange was not "solely in exchange for stock" as required by section 351. Courts have consistently recognized, however, that issuing stock in this situation would be a meaningless gesture: Because Peracchi is the sole shareholder of NAC, issuing additional stock would not affect his economic position relative to other shareholders. See, e.g., Jackson v. Commissioner, 708 F.2d 1402, 1405 (9th Cir.1983).

**13.** We would face a different case had the Treasury promulgated a regulation interpreting section 357(c). A revenue ruling is entitled to some deference as the stated litigating position of the agency which enforces the tax code, but not nearly as much as a regulation. Ruling 68-629 offers no rationale, let alone a reasonable one, for its holding that it costs a taxpayer nothing to write a promissory note, and thus deserves little weight.

would suddenly make the note highly significant. Peracchi and NAC are separated by the corporate form, and this gossamer curtain makes a difference in the shell game of C Corp organization and reorganization. Contributing the note puts a million dollar nut within the corporate shell, exposing Peracchi to the cruel nutcracker of corporate creditors in the event NAC goes bankrupt. And it does so to the tune of $1,060,000, the full face amount of the note. Without the note, no matter how deeply the corporation went into debt, creditors could not reach Peracchi's personal assets. With the note on the books, however, creditors can reach into Peracchi's pocket by enforcing the note as an unliquidated asset of the corporation.

The key to solving this puzzle, then, is to ask whether bankruptcy is significant enough a contingency to confer substantial economic effect on this transaction. If the risk of bankruptcy is important enough to be recognized, Peracchi should get basis in the note: He will have increased his exposure to the risks of the business—and thus his economic investment in NAC—by $1,060,000. If bankruptcy is so remote that there is no realistic possibility it will ever occur, we can ignore the potential economic effect of the note as speculative and treat it as merely an unenforceable promise to contribute capital in the future.

When the question is posed this way, the answer is clear. Peracchi's obligation on the note was not conditioned on NAC's remaining solvent. It represents a new and substantial increase in Peracchi's investment in the corporation.[14] The Code seems to recognize that economic exposure of the shareholder is the ultimate measuring rod of a shareholder's investment. *Cf.* I.R.C. § 465 (at-risk rules for partnership investments). Peracchi therefore is entitled to a step-up in basis to the extent he will be subjected to economic loss if the underlying investment turns unprofitable. *Cf. HGA Cinema Trust v. Commissioner,* 950 F.2d 1357, 1363 (7th Cir.1991) (examining effect of bankruptcy to determine whether long-term note contributed by partner could be included in basis). *See also* Treas. Reg. § 1.704–1(b)(2)(ii)(c)(1) (recognizing economic effect of promissory note contributed by partner for purposes of partner's obligation to restore deficit capital account).

The economics of the transaction also support Peracchi's view of the matter. The transaction here does not differ substantively from others that would certainly give Peracchi a boost in basis. For example, Peracchi could have borrowed $1 million from a bank and contributed the cash to NAC along with the properties. Because cash has a basis equal to face value, Peracchi would not have faced any section 357(c) gain. NAC could then have purchased the note from the bank for $1 million which, assuming the bank's original assessment of Peracchi's creditworthiness was accurate, would be the fair market value of the note. In the end the corporation would hold a million dollar note from Peracchi—just like it does now—and Peracchi would face no section 357(c) gain.[15] The

---

**14.** We confine our holding to a case such as this where the note is contributed to an operating business which is subject to a non-trivial risk of bankruptcy or receivership. NAC is not, for example, a shell corporation or a passive investment company; Peracchi got into this mess in the first place because NAC was in financial trouble and needed more assets to meet Nevada's minimum premium-to-asset ratio for insurance companies.

**15.** In a similar vein, Peracchi could have first swapped promissory notes with a third party. Assuming the bona fides of each note, Peracchi would take a cost basis in the third party note equal to the face value of the note he gave up. Peracchi could then contribute the third party note to NAC, and (thanks to the added basis) avoid any section 357(c) gain. NAC could then

close the circle by giving the third party note back to the third party in exchange for Peracchi's note, leaving Peracchi and NAC in exactly the same position they occupy now.

The IRS might attack these maneuvers as step transactions, but that would beg the question: Does the contribution of a shareholder's note to his wholly-owned corporation have any real economic effect, or is it just so much window dressing? If the debt has real economic effect, it shouldn't matter how the shareholder structures the transaction.

The only substantive difference between the avoidance techniques just discussed—swapping notes or borrowing from a third party—and the case here is the valuation role implicitly performed by the third party. A bank would not give Peracchi the face value of the note unless his credit warranted it, while we have no assurance

only economic difference between the transaction just described and the transaction Peracchi actually engaged in is the additional costs that would accompany getting a loan from the bank. Peracchi incurs a "cost" of $1 million when he promises to pay the note to the bank; the cost is not diminished here by the fact that the transferor controls the initial transferee. The experts seem to agree: "Section 357(c) can be avoided by a transfer of enough cash to eliminate any excess of liabilities over basis; and since a note given by a solvent obligor in purchasing property is routinely treated as the equivalent of cash in determining the basis of the property, it seems reasonable to give it the same treatment in determining the basis of the property transferred in a § 351 exchange." Bittker & Eustice ¶ 3.06[4][b].

We are aware of the mischief that can result when taxpayers are permitted to calculate basis in excess of their true economic investment. *See Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983). For two reasons, however, we do not believe our holding will have such pernicious effects. First, and most significantly, by increasing the taxpayer's personal exposure, the contribution of a valid, unconditional promissory note has substantial economic effects which reflect his true economic investment in the enterprise. The main problem with attributing basis to nonrecourse debt financing is that the tax benefits enjoyed as a result of increased basis do not reflect the true economic risk. Here Peracchi will have to pay the full amount of the note with after-

tax dollars if NAC's economic situation heads south. Second, the tax treatment of nonrecourse debt primarily creates problems in the partnership context, where the entity's loss deductions (resulting from depreciation based on basis inflated above and beyond the taxpayer's true economic investment) can be passed through to the taxpayer. It is the pass-through of losses that makes artificial increases in equity interests of particular concern. *See, e.g., Levy v. Commissioner*, 732 F.2d 1435, 1437 (9th Cir.1984). We don't have to tread quite so lightly in the C Corp context, since a C Corp doesn't funnel losses to the shareholder.[16]

We find further support for Peracchi's view by looking at the alternative: What would happen if the note had a zero basis? The IRS points out that the basis of the note in the hands of the corporation is the same as it was in the hands of the taxpayer. Accordingly, if the note has a zero basis for Peracchi, so too for NAC. *See* I.R.C. § 362(a).[17] But what happens if NAC—perhaps facing the threat of an involuntary petition for bankruptcy—turns around and sells Peracchi's note to a third party for its fair market value? According to the IRS's theory, NAC would take a carryover basis of zero in the note and would have to recognize $1,060,000 in phantom gain on the subsequent exchange, even though the note did not appreciate in value one bit. That can't be the right result.

■ Accordingly, we hold that Peracchi has a basis of $1,060,000 in the note he wrote to NAC. The aggregate basis exceeds the

---

that NAC wouldn't do so. We readily acknowledge that our assumptions fall apart if the shareholder isn't creditworthy. Here, the government has stipulated that Peracchi's net worth far exceeds the value of the note, so creditworthiness is not at issue. But we limit our holding to cases where the note is in fact worth approximately its face value.

**16.** Our holding therefore does not extend to the partnership or S Corp context.

**17.** *But see Lessinger v. Commissioner*, 872 F.2d 519 (2d Cir.1989). In *Lessinger*, the Second Circuit analyzed a similar transaction. It agreed with the IRS's (faulty) premise that the note had a zero basis in the taxpayer's hands. But then, brushing aside the language of section 362(a), the court concluded that the note had a basis in

the *corporation's* hands equal to its face value. The court held that this was enough to dispel any section 357(c) gain to the taxpayer, proving that two wrongs sometimes do add up to a right.

We agree with the IRS that *Lessinger*'s approach is untenable. Section 357(c) contemplates measuring basis of the property contributed in the hands of the taxpayer, not the corporation. Section 357 appears in the midst of the Code sections dealing with the effect of capital contributions on the shareholder; sections 361 et seq., on the other hand, deal with the effect on a corporation, and section 362 defines the basis of property contributed in the hands of the corporation. Because we hold that the note has a face value basis to the shareholder for purposes of section 357(c), however, we reach the same result as *Lessinger*.

liabilities of the properties transferred to NAC under section 351, and Peracchi need not recognize any section 357(c) gain.

### Genuine Indebtedness or Sham?

■ The Tax Court never reached the issue of Peracchi's basis in the note. Instead, it ruled for the Commissioner on the ground that the note is not genuine indebtedness. The court emphasized two facts which it believed supported the view that the note is a sham: (1) NAC's decision whether to collect on the note is wholly controlled by Peracchi and (2) Peracchi missed the first two years of payments, yet NAC did not accelerate the debt. These facts certainly do suggest that Peracchi paid imperfect attention to his obligations under the note, as frequently happens when debtor and creditor are under common control. But we believe the proper way to approach the genuine indebtedness question is to look at the face of the note and consider whether Peracchi's legal obligation is illusory. And it is not. First, the note's bona fides are adequate: The IRS has stipulated that Peracchi is creditworthy and likely to have the funds to pay the note; the note bears a market rate of interest commensurate with his creditworthiness; the note has a fixed term. Second, the IRS does not argue that the value of the note is anything other than its face value; nothing in the record suggests NAC couldn't borrow against the note to raise cash. Lastly, the note is fully transferable and enforceable by third parties, such as hostile creditors. On the basis of these facts we hold that the note is an ordinary, negotiable, recourse obligation which must be treated as genuine debt for tax purposes. *See Sacks v. Commissioner*, 69 F.3d 982, 989 (9th Cir.1995).

18. *See* Daniel N. Shaviro, Risk and Accrual: The Tax Treatment of Nonrecourse Debt, 44 Tax L.Rev. 401, 427 (1989); Sang I. Ji, Nonrecourse Financing of Real Property: Depreciation Allocation and Full Recapture to Minimize Deferral and Eliminate Conversion, 29 Colum. J.L. & Soc. Prob. 217 (1996).

19. Section 357(b)(1) provides: .
    (b) Tax Avoidance purpose.
       (1) In general. If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it

■ The IRS argues that the note is nevertheless a sham because it was executed simply to avoid tax. Tax avoidance is a valid concern in this context; section 357(a) does provide the opportunity for a bailout transaction of sorts. For example, a taxpayer with an unencumbered building he wants to sell could take out a nonrecourse mortgage, pocket the proceeds, and contribute the property to a newly organized corporation. Although the gain would be preserved for later recognition, the taxpayer would have partially cashed out his economic investment in the property: By taking out a nonrecourse mortgage, the economic risk of loss would be transferred to the lender.[18] Section 357(b) addresses this sort of bailout by requiring the recognition of gain if the transaction lacks a business purpose.[19]

Peracchi's capital contribution is not a bailout. Peracchi contributed the buildings to NAC because the company needed additional capital, and the contribution of the note was part of that transaction. The IRS, in fact, stipulated that the contribution had a business purpose. Bailout potential exists regardless of whether the taxpayer contributes a note along with the property; section 357(b), not 357(c), is the sword the Service must use to attack bailout transactions.

### Is the note a gift?

■ The IRS also offers a more refined version of the sham transaction argument: The note was really a gift to NAC because Peracchi did not receive any consideration from the exchange. The IRS admits that the tax deferral resulting from avoiding section 357(c) gain is a benefit to Peracchi. It ar-

appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a)—
   (A) was a purpose to avoid Federal income tax on the exchange, or
   (B) if not such a purpose, was not a bona fide business purpose,
then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange) shall, for purposes of section .351 or 361 (as the case may be), be considered as money received by the taxpayer on the exchange.

gues, nonetheless, that this is not enough to make the bargain enforceable because it works no detriment to NAC. This argument would classify all contributions of capital as gifts. A corporation never gives up anything explicitly when it accepts a capital contribution. Instead, the corporation implicitly promises to put the money to good use, and its directors and officers undertake the fiduciary duty to generate the highest possible return on the investment. The contribution of the note was no more a gift than the contribution of $1 million in cash to the corporation would have been; it does not reflect the "detached and disinterested generosity" which characterizes a gift for purposes of federal income taxation. *See Commissioner v. Duberstein*, 363 U.S. 278, 285, 80 S.Ct. 1190, 1196–97, 4 L.Ed.2d 1218 (1960).

### The Aftermath

We take a final look at the result to make sure we have not placed our stamp of approval on some sort of exotic tax shelter. We hold that Peracchi is entitled to a step up in basis for the face value of the note, just as if he contributed cash to the corporation. *See* I.R.C. § 358. If Peracchi does in fact keep his promise and pay off the note with after tax dollars, the tax result is perfectly appropriate: NAC receives cash, and the increase in basis Peracchi took for the original contribution is justified. Peracchi has less potential gain, but he paid for it in real dollars.

But what if, as the IRS fears, NAC never does enforce the note? If NAC goes bankrupt, the note will be an asset of the estate enforceable for the benefit of creditors, and Peracchi will eventually be forced to pay in after tax dollars. Perachhi will undoubtedly have worked the deferral mechanism of section 351 to his advantage, but this is not inappropriate where the taxpayer is on the hook in both form and substance for enough cash to offset the excess of liabilities over basis. By increasing his personal exposure

to the creditors of NAC, Peracchi has increased his economic investment in the corporation, and a corresponding increase in basis is wholly justified.[20]

### Conclusion

We hold that Peracchi has a basis of $1,060,000 in the note, its face value. As such, the aggregate liabilities of the property contributed to NAC do not exceed its basis, and Peracchi does not recognize any section 357(c) gain. The decision of the Tax Court is **REVERSED.** The case is remanded for entry of judgment in favor of Peracchi.

FERNANDEZ, Circuit Judge, Dissenting:

Is there something that a taxpayer, who has borrowed hundreds of thousands of dollars more than his basis in his property, can do to avoid taxation when he transfers the property? Yes, says Peracchi, because by using a very clever argument he can avoid the strictures of 26 U.S.C. § 357(c). He need only make a promise to pay by giving a "good," though unsecured, promissory note to his corporation when he transfers the property to it. That is true even though the property remains subject to the encumbrances. How can that be? Well, by preparing a promissory note the taxpayer simply creates basis without cost to himself. *But see* 26 U.S.C. § 1012; Rev. Rul. 68–629, 1968–2 C.B. 154; *Alderman v. Commissioner*, 55 T.C. 662, 665, 1971 WL 2488 (1971). Thus he can extract a large part of the value of the property, pocket the funds, use them, divest himself of the property, and pay the tax another day, if ever at all.

But as with all magical solutions, the taxpayer must know the proper incantations and make the correct movements. He cannot just transfer the property to the corporation and promise, or be obligated, to pay off the encumbrances. That would not change the fact that the property was still subject to

---

**20.** What happens if NAC does not go bankrupt, but merely writes off the note instead? Peracchi would then face discharge of indebtedness income to the tune of $1,060,000. This would put Peracchi in a worse position than when he started, since discharge of indebtedness is normally treated as ordinary income. Peracchi, having increased his basis in the stock of the corporation by $1,060,000 would receive a capital loss (or less capital gain) to that extent. But the shift in character of the income will normally work to the disadvantage of a taxpayer in Peracchi's situation.

those encumbrances. According to Peracchi, the thaumaturgy that will save him from taxes proceeds in two simple steps. He must first prepare a ritualistic writing—an unsecured promissory note in an amount equal to or more than the excess of the encumbrances over the basis. He must then give that writing to his corporation. That is all.[1] But is not that just a "promise to pay," which "does not represent the paying out or reduction of assets?" *Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 583, 97 S.Ct. 850, 858, 51 L.Ed.2d 48 (1977). Never mind, he says. He has nonetheless increased the total basis of the property transferred and avoided the tax. I understand the temptation to embrace that argument, but I see no real support for it in the law.

Peracchi says a lot about economic realities. I see nothing real about that maneuver. I see, rather, a bit of sortilege that would have made Merlin envious. The taxpayer has created something—basis—out of nothing.

Thus, I respectfully dissent.

1. What is even better, he need not even make payments on the note until after the IRS catches up with him. I, by the way, am dubious about the proposition that the Tax Court clearly erred when it held that the note was not even a genuine indebtedness.