# United States Tax Court

T.C. Memo. 2025-125

DAVID S. ALIOTO,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 12587-18.                    Filed December 4, 2025.

————

*W. Michael Conway*, for petitioner.

*Justin E. Wayne* and *Gary R. Shuler*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, *Chief Judge*: Petitioner, David S. Alioto, challenges deficiency determinations of the Internal Revenue Service (IRS) for his 2014 and 2015 tax years, as well as additions to tax for the latter year.[1] The IRS contends that Mr. Alioto failed to correctly report on his personal income tax returns wage income, constructive dividends, and capital gain income, while improperly deducting expenses of a business that he owned. We decide in favor of the Commissioner.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

**[\*2]**                    FINDINGS OF FACT

We held trial in this case and draw the following facts from the pleadings, stipulations of facts (together with their attached exhibits),[2] and the evidence introduced at trial. Mr. Alioto lived in Ohio when he timely filed his petition.

I.    *Mr. Alioto's Business Background*

Mr. Alioto is a businessman with many years of experience in the freight transportation industry. His career began in 1986 and included stints as the chief executive officer of two transportation logistics companies, including one that he started himself. Mr. Alioto later transitioned into strategic consulting.

A.    *Probity Enterprises, Inc.*

Mr. Alioto incorporated Probity Enterprises, Inc. (Probity), in Ohio in 2011. Mr. Alioto was Probity's sole initial director and held all 1,000 shares of the company's stock, which had a par value of $0.01 at the time of incorporation. Probity's initial articles of incorporation reflected that it had been incorporated to provide contract services focused on the transportation and logistics industry. Probity subsequently developed a proprietary process called Transportation Network Solution Program (TNS Program),[3] which enabled a more efficient integration and allocation of truck load orders from shippers to transportation providers.

In 2013 Probity entered into an agreement with American Global Logistics, Inc. (American Global). Under this agreement, American Global paid a commission based on a percentage of revenues derived from the processing of ocean containers. Although Mr. Alioto signed the agreement as CEO of Probity, the relevant Form 1099-MISC, Miscellaneous Income, showed that American Global paid Mr. Alioto $22,800 during 2014.

---

[2] The stipulations of facts contained certain objections by both parties, and we reserved ruling on those objections and the ultimate admissibility of the underlying documents. Neither party made any arguments at trial or on brief in support of their objections, and we will accordingly overrule the objections, admitting into evidence the stipulations and supporting exhibits in their entirety.

[3] At times, the parties used a slightly different name for the proprietary process. We will use the name as agreed in the stipulation.

[*3]    On June 9, 2014, Probity entered into a contract services agreement with a freight logistics company, Transplace Texas, LP (Transplace), related to the TNS Program.  The agreement provided that Probity would market the TNS Program to shippers, manage the key elements for all participants, and use Transplace as the primary transportation network provider in the United States, Mexico, and Canada.

As part of this deal, Transplace agreed to pay a "program fee" of $5,000 per week for the first 22 weeks to "support Probity's initial expenses related to the TNS Program."  It also contracted to pay Probity a monthly commission of 20% on all net revenues from TNS Program shipments, which were to be reduced until the initial program fee had been repaid.  The agreement further provided that Probity would reimburse the program fee in the event of termination.  In 2014 Transplace paid Probity $105,000 under the agreement.

B.    *Internal Shuffles*

A few days after finalizing the Transplace contract, Mr. Alioto entered into an employment agreement with Probity (signed by his wife, Melanie Alioto, as Treasurer) to perform the duties of President and CEO.  The employment agreement provided for compensation of $550,000, payable in one lump sum on January 31, 2018, as well as the reimbursement of "[a]ll reasonable expenses arising out of employment."  Mr. Alioto did not receive the compensation outlined in the employment agreement.

Several stock transactions followed.  On August 28, 2014, Mr. Alioto, who up to this time owned all 1,000 shares of Probity stock, transferred 501 shares to his wife for a price of $5.01, i.e., $0.01 per share.  Just a week later (on September 4), Mrs. Alioto transferred 376 shares back to Mr. Alioto, again for a penny a share.  On the following day, she transferred the remaining 125 shares to Probity itself for the same price.

Although these transfers left Mr. Alioto holding 875 shares and Probity holding 125 shares, Probity nonetheless filed an amendment to its articles of incorporation with the Ohio secretary of state on January 14, 2015, which reflected that Mrs. Alioto owned 501 shares and Mr. Alioto owned 499 shares of common stock.  The amended articles of incorporation further reflected that the par value of each share remained $0.01.

**[\*4]** Despite the representations on the amended articles of incorporation, Mr. Alioto entered into a promissory note on February 3, 2015, to purchase 125 shares of stock from Probity for $500,000, which was to be paid (with 3% annual interest) by February 5, 2018. Mrs. Alioto signed on behalf of Probity, and Mr. Alioto valued the stock himself. [4] He made no payments on the promissory note, asserting that it was offset by the unpaid compensation from his employment agreement.

Between March and November 2015, Mr. Alioto sold 298 shares of Probity stock to business associates and family members for a total of $142,720. The record does not reflect whether the shares sold included the 125 shares associated with the promissory note or were part of the other 875 shares that he held. Mr. Alioto first sold 154 shares to a member of Probity's advisory board in March 2015 for $130 per share. In May and July he sold 95 shares at $260 per share to a member of his family and a family-related trust. Between August and November 2015, Mr. Alioto sold 49 shares for $2,000 per share to various family members and business associates.[5] He also gave one share each to his son and stepson.

C.    *Headwinds*

In May 2016 Transplace terminated its contract services agreement with Probity and requested that Probity reimburse the $105,000 program fee that it had paid. Probity refused. Transplace sued. After a year of litigation, Transplace dropped its suit. Although Probity retained the program fee, this was a pyrrhic victory as it spent over $200,000 in legal fees and settlement costs and experienced major delays in the startup of key TNS Program contracts.

Probity eventually recovered from this setback and, as of the time of trial, was still using the TNS Program in its logistics business.

---

[4] Probity issued Mrs. Alioto a Form 1099-MISC for 2015 reporting nonemployee compensation of $18,720. Mr. Alioto's Social Security number was listed under the payor section of the Form 1099-MISC.

[5] In 2018 after an investigation into possible violations of the Ohio Securities Act, Mr. Alioto offered the purchasers of Probity stock the opportunity to rescind their purchases. One investor who had purchased 25 shares at $2,000 per share requested the return of his investment.

[*5] II.    *Tax Reporting and Examination*

A.    *Original Proceedings*

Mr. Alioto timely filed his 2014 federal income tax return, reporting, inter alia, a negative adjusted gross income of $12,773.  In reaching this number, Mr. Alito reported that Probity had gross income of $22,800 and total expenses (inclusive of expenses for business use of home) of $35,573.  As to the latter category, Mr. Alioto reported on Schedule C, Profit or Loss From Business, $11,545 in car and truck expenses, $9,985 in other interest expenses, $5,589 in travel expenses, $5,957 for utilities, $276 for supplies, $1,073 in "other" expenses, and $1,148 in expenses for the business use of his home.  Mr. Alioto did not timely file his 2015 federal income tax return.

The IRS subsequently examined Mr. Alioto's 2014 and 2015 tax returns.  Relying on a bank deposit analysis of Mr. Alioto's individual accounts, his joint accounts with his wife, and Probity's accounts, the IRS concluded that he had unreported income for both 2014 and 2015.  The IRS accordingly prepared a substitute for return for 2015 and issued a notice of deficiency for both years, determining deficiencies of $30,675 for 2014 and $9,094 for 2015, as well as an accuracy-related penalty for 2014 and additions to tax for 2015.[6]

As to tax year 2014, the notice of deficiency determined that Mr. Alioto's gross taxable income was $132,834 and that he had failed to report $110,034 in gross business income.  The notice further disallowed most of his claimed deductions except (1) utilities expenses, which were reduced from $5,957 to $2,000; (2) the business use of his home, which was increased from $1,148 to $2,616; and (3) car and truck expenses, for which an additional $18,127 was recognized.

As to tax year 2015, the notice determined capital gain of $142,170 based on the sale of Probity stock and $5,338 in gross receipts.  The notice allowed deductions of $1,397 for utilities, $18,720 for contract labor expenses, and $25,316 for car and truck expenses.

---

[6] The Commissioner subsequently conceded the accuracy-related penalty that had been asserted with respect to 2014.

[*6]  B.    *Amendments During Litigation*

Mr. Alioto timely petitioned this Court.  We later continued this case to allow the IRS to examine Probity's 2014 and 2015 tax years[7] to "ensure that the income and expenses of [Mr. Alioto] are properly reported."  The parties understood that several issues in the Probity examination "directly impact[ed] the consideration of [Mr. Alioto's] case," including (1) whether nonemployment compensation is reportable by Mr. Alioto or Probity, (2) whether Mr. Alioto received wages from Probity, (3) whether expenses are deductible by Mr. Alioto or Probity, and (4) whether Mr. Alioto received constructive dividends from Probity. Mr. Alioto, as Probity's president, and his counsel were active participants in this examination.

The IRS thereafter issued a notice of deficiency to Probity, which determined a tax liability of $4,296 for 2014 and no tax liability for 2015. Among other things, the notice concluded that Probity received gross receipts for commission income and program fee income of $132,834 for 2014 and $5,241 for 2015.  It further stated that Probity had paid deductible officer compensation to Mr. and Mrs. Alioto of $104,191 in 2014 and $24,004 in 2015.  The compensation for Mr. Alioto was derived from transfers from Probity's account to his personal account, amounting to $89,900 in 2014 and $6,044 in 2015.

The notice also disallowed deductions for various business expenses (appearing to be the same ones reported on Mr. Alioto's Schedule C) for lack of substantiation.  And it concluded that Mr. Alioto had received constructive dividends in each year because of Probity's payment of certain personal expenses.  Probity did not challenge the notice in this Court.

The Commissioner thereafter filed an amendment to his answer to take positions consistent with the Probity notice of deficiency. Specifically, for 2014, the Commissioner reduced Mr. Alioto's taxable income from $132,834 to $89,800, alleged constructive dividends of $13,282, and disallowed all of Mr. Alioto's claimed Schedule C deductions. These adjustments resulted in the shrinking of the 2014

---

[7] On August 14, 2017, the IRS received Forms 1120, U.S. Corporation Income Tax Return, for Probity's 2011–13 tax years, which were signed by Mr. Alioto as its president (although these years predated his employment agreement).  On the same date, Probity electronically filed a 2014 federal income tax return, which bore no signature aside from that of the tax return preparer.  The IRS has no record of receiving Probity's 2015 tax return.

**[\*7]** deficiency from \$30,675 to \$20,511. With respect to 2015, the amendment asserted (1) constructive dividends of \$1,377, (2) capital gain of \$143,453,[8] (3) wages of \$6,044, and (4) the disallowance of all Schedule C deductions referenced in the original notice of deficiency. These adjustments resulted in an increased deficiency of \$16,764 for 2015.

## OPINION

I.    *Legal Standard*

    A.    *Burden of Proof*

The IRS's determinations in a notice of deficiency are generally presumed correct, and a taxpayer bears the burden to prove them erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).

> In the context of unreported income, the Court of Appeals for the Sixth Circuit has held that before the notice of deficiency is entitled to a presumption of correctness, such determinations must be supported by at least a "minimal" factual predicate or foundation of substantive evidence linking the taxpayer to the income-producing activity or to the receipt of funds.

*Garavaglia v. Commissioner*, T.C. Memo. 2011-228, 2011 WL 4448913, at \*19, *aff'd*, 521 F. App'x 476 (6th Cir. 2013); *see also Walquist v. Commissioner*, 152 T.C. 61, 67 (2019). We have long accepted the bank deposits method to make this showing. *See Clayton v. Commissioner*, 102 T.C. 632, 645–46 (1994). The bank deposits method assumes all deposits are taxable, but the Commissioner must account for any nontaxable source or deductible expense of which he has knowledge. *Id.*

The notice of deficiency in this case reflected unreported business income of \$110,034 for his 2014 tax year and unreported income of \$147,508 for his 2015 tax year (made up of \$142,170 in capital gain income and \$5,338 in business income). The evidence at trial, which included bank deposit information from the accounts controlled by Mr.

---

[8] The discrepancy between the notice of deficiency and the amendment to answer with respect to the amount of capital gain stems from an adjustment disallowing "capital gain/loss per return" of \$1,283.

[*8] Alioto and the record of Mr. Alioto's stock sales, provides the required evidentiary foundation.

The presumption of correctness does not attach to all issues before us, however. The burden of proof shifts to the Commissioner with respect to any "new matter" or "increase[] in deficiency." Rule 142(a)(1); *see Turner v. Commissioner*, 68 T.C. 48, 50 (1977).

During the proceedings in this case, the Commissioner introduced several new matters on which he bears the burden. First, the Commissioner bears the burden as to his assertion (in the amendment to answer) that Mr. Alioto had received constructive dividends in 2014 and 2015 via Probity's payment of his personal expenses. Second, the Commissioner bears the burden as to the increased amount of business income for 2015 that he asserted in his amendment. Third, the Commissioner bears the burden as to the disallowance of a capital loss deduction of $1,283 as purportedly claimed on Mr. Alioto's 2015 return. Finally, the Commissioner bears the burden on the full disallowance of those deductions that he allowed in part in the original notice, i.e., deductions for utilities and car and truck expenses for both years, a deduction for the business use of Mr. Alioto's home for 2014, and a deduction for contract labor expenses for 2015.

B.     *Recordkeeping*

A taxpayer is required to keep sufficient records to substantiate his gross income, deductions, credits, and other tax attributes. *See* I.R.C. § 6001; Treas. Reg. § 1.6001-1(a); *see also* Treas. Reg. § 1.6001-1(e) ("The books or records . . . shall be retained so long as the contents thereof may become material in the administration of any internal revenue law."). Adequate substantiation must establish the nature, amount, and purpose of a claimed deduction. *See, e.g.*, *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001); *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976).

For some types of expenses, lack of substantiation can be overcome. *See, e.g.*, *Phillips v. Commissioner*, T.C. Memo. 2013-215, at *22–23. If a taxpayer establishes that a deductible expense has been paid but cannot establish the precise amount of the deductible expense, the Court may estimate the amount. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930).

In making the estimate, the Court bears heavily against the taxpayer who failed to more precisely substantiate the expense. *See id.*

**[\*9]** at 544; *see also Rogers v. Commissioner*, T.C. Memo. 2014-141, at \*17. The Court will not estimate a deductible expense unless the taxpayer presents a sufficient evidentiary basis on which an estimate can be made. *See Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985); *Rodriguez v. Commissioner*, T.C. Memo. 2009-22, 2009 WL 211430, at \*4 (stating, with respect to the *Cohan* rule, that "we can't just guess").

A court may not invoke the *Cohan* doctrine to estimate the amount of a deductible expense subject to the strict substantiation requirements in section 274(d). Such expenses include those relating to travel, meals and entertainment, gifts, and "listed property" under section 280F(d)(4). I.R.C. § 274(d). No deduction is allowed for such expenses "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement" (A) the amount of the expense, (B) the time and place of the travel or the use of the property, (C) the business purpose of the expense, and (D) the business relationship of the person using the property. *Id.*; *see Nwafor v. Commissioner*, T.C. Memo. 2025-27, at \*8 (citing *Eze v. Commissioner*, T.C. Memo. 2022-83, at \*6, *aff'd*, No. 23-1062, 2023 WL 6972451 (4th Cir. Oct. 23, 2023)).

II.    *Analysis*

   A.    *Unreported Income*

"[G]ross income means all income from whatever source derived," including compensation for services such as wages and salaries, gross income derived from business, and dividends, among others. I.R.C. § 61(a); *accord Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429–31 (1955). Where a taxpayer fails to maintain adequate books and records to establish their income and expenses, the Commissioner may reconstruct income through any reasonable method that clearly reflects income. *See* I.R.C. § 446(b); *Petzoldt v. Commissioner*, 92 T.C. 661, 693 (1989). The evidence before us establishes that Mr. Alioto had three different types of unreported income during 2014 and 2015: (1) wage income; (2) constructive dividends; and (3) capital gain income. We will discuss each in turn.

**[\*10]**     1.     *Wage Income*

The evidence first shows that Probity paid Mr. Alioto $89,900 in 2014 and $6,044 in 2015.[9]  These amounts are supported by a bank deposit analysis performed during the examination of Mr. Alioto's returns, as modified by the Probity examination.

Mr. Alioto does not contest his receipt of these payments but asserts that they were not taxable wage income.  He argues that the 2014 payments were advance expense reimbursements pursuant to an accountable plan, and that the 2015 payments were merely a return of money that he had provided as part of a test of Probity's payment portal.

As an initial matter, we reject Mr. Alioto's contention that the 2014 payments were not taxable because they were advance expense reimbursements under an accountable plan.  *See, e.g.*, I.R.C. § 62(a)(2)(A); Treas. Reg. § 1.62-2(c)(4).  Although "[a]mounts treated as paid under an accountable plan are excluded from the employee's gross income," Treas. Reg. § 1.62-2(c)(4), the arrangement must satisfy certain requirements as to business purpose, substantiation, and return of excess expense amounts, *see id.* subpara. (1).  Mr. Alioto fails to introduce a plan into evidence, much less persuade us that any such arrangement would satisfy the Code and the Treasury regulations.

Mr. Alioto fares no better with respect to 2015.  The Commissioner satisfied his burden to show that Mr. Alioto received $6,044 in wages during 2015.  Mr. Alioto asserts that certain bank transactions demonstrate that this amount was not income but represented a repayment of funds used to test Probity's payment portal.  The bank transaction evidence, however, is inconclusive, and Mr. Alioto did not testify or introduce any other evidence that might support his current contention.  Mr. Alioto cannot use his brief to paper over gaps in the evidence.  *See* Rule 143(c) ("[S]tatements in briefs . . . do not constitute evidence."); *see also Barrios v. Commissioner*, T.C. Memo. 2023-32, at \*5 ("[Statements in briefs] cannot supplement the record . . . .").

The duty of consistency further supports the treatment of these amounts as wage income to Mr. Alioto.  "The duty of consistency prevents a taxpayer from benefiting in a later year from an error or omission in an earlier year which cannot be corrected because the time

---

[9] Although Mr. Alioto asserts that he received $93,000 from Probity in 2014, we will consider the lower amount identified by the Commissioner in his brief.

**[*11]** to assess tax for the earlier year has expired." *Estate of Letts v. Commissioner*, 109 T.C. 290, 296 (1997) (footnote omitted), *aff'd*, 212 F.3d 600 (11th Cir. 2000) (unpublished table decision). The duty applies when (1) the taxpayer has made a representation or reported an item for tax purposes in one year, (2) the Commissioner has acquiesced in or relied on that act for that year, and (3) the taxpayer desires to change the representation, previously made, in a later year after the statute of limitations on assessment bars adjustments for the initial year. *See, e.g.*, *Berman v. Commissioner*, 163 T.C. 1, 21 (2024); *Cluck v. Commissioner*, 105 T.C. 324, 332 (1995). A taxpayer may be estopped by a prior representation made by or on behalf of another taxpayer when a sufficiently close relationship exists between the party making the prior representation and the party to be estopped. *Cluck*, 105 T.C. at 335.

The extremely tight relationship between Probity and Mr. Alioto triggers the duty of consistency here. Mr. Alioto was Probity's founder, president, majority shareholder (aside from the week in 2014 when shares were briefly held by Mrs. Alioto), and animating force. Mr. Alioto also was the only signatory on Probity's tax returns, aside from its tax return preparer. When we paused these proceedings to conduct an examination into Probity to "ensure that the income and expenses of [Mr. Alioto] are properly reported," Mr. Alioto participated on Probity's behalf. And he did so with the understanding that the Probity examination "directly impact[ed]" whether he had received wages from Probity.

Pulling all these strands together persuades us that the duty of consistency should obtain. Probity (Mr. Alioto's creation) received a benefit from the examination (in which Mr. Alioto participated) in the form of a deduction for officer compensation of $104,191 for 2014 and $24,004 for 2015. Probity (again, with Mr. Alioto ostensibly as decider) chose not to challenge in this Court the officer compensation determination specifically or the notice of deficiency more generally. The duty of consistency thus supports treating the amounts attributable to payments to Mr. Alioto, i.e., $89,900 for 2014 and $6,044 for 2015, as wage income in this case.

### 2. *Constructive Dividends*

"Where a corporation confers an economic benefit on a shareholder without the expectation of repayment, that benefit becomes a constructive dividend, taxable to the shareholder, even though neither

**[\*12]** the corporation nor the shareholder intended a dividend." *Magnon v. Commissioner*, 73 T.C. 980, 993–94 (1980); *see also Greenblatt v. Commissioner*, T.C. Memo. 2024-109, at \*21–22. "A greater potential for constructive dividends . . . exists in closely held corporations where dealings between stockholders and the corporation are commonly characterized by informality." *Greenblatt*, T.C. Memo. 2024-109, at \*22 (quoting *Zhadanov v. Commissioner*, T.C. Memo. 2002-104, 2002 WL 731708, at \*11).

The record before us shows that Probity paid personal living expenses (primarily food and fuel) of Mr. Alioto to the tune of $13,282 in 2014 and $1,377 in 2015. Although Mr. Alioto claims that these expenses were related to Probity business, he offers no support to refute the Commissioner's conclusion that these were his personal expenses. *See, e.g., Phillips v. Commissioner*, T.C. Memo. 2013-215, at \*25; *Hopkins v. Commissioner*, T.C. Memo. 2005-49, 2005 WL 615687, at \*5 ("A taxpayer's general statement that his or her expenses were incurred in pursuit of a trade or business is not sufficient to establish that the expenses had a reasonably direct relationship to any such trade or business."); *cf. Cherizol v. Commissioner*, T.C. Memo. 2014-119, at \*11 ("In deciding whether a taxpayer has satisfied his or her burden of substantiating a deduction, we are not required to accept the taxpayer's self-serving, undocumented testimony.").[10] We accordingly conclude that Mr. Alioto received constructive dividends in the amounts shown by the bank deposit analysis.

### 3. *Capital Gain Income*

"Gain derived from the disposition of property equals the amount realized by the taxpayer in excess of his adjusted basis." *Kim v. Commissioner*, T.C. Memo. 2023-91, at \*4; *see also* I.R.C. § 1001(a). Mr. Alioto does not dispute that the Probity stock that he sold in 2015 was a capital asset, *see* I.R.C. § 1221(a)(1), and he thus was subject to tax on the net capital gain he realized from these sales. In the original notice

---

[10] Section 316(a) provides that a dividend is "any distribution of property made by a corporation to its shareholders—(1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year." Although neither party analyzes Probity's earnings and profits, the evidence before us, including the payments under the Transplace contract, compels the conclusion that Probity had sufficient earnings and profits to support the amounts of constructive dividends determined for 2014 and 2015.

**[\*13]** of deficiency, the IRS determined long-term capital gain of $142,170 from the disposition of shares in 2015.

Mr. Alioto counters that he held two tranches of Probity stock with different basis amounts as of February 2015: (1) 875 shares in which he had a basis of $0.01 per share (penny stock), i.e., the original issued stock and shares he purchased from his wife in September 2014, and (2) 125 shares in which he had a basis of $4,000 per share, i.e., the stock Probity transferred in connection with the promissory note (treasury stock). According to Mr. Alioto, he sold 274 shares of the penny stock in 2015 and 36 shares of the treasury stock, which produced a net capital loss of $1,283 for 2015.[11]

Mr. Alioto fails to meet his burden of proof in several respects. As an initial matter, he did not prove which stock he sold in 2015. Although he includes stock certificate numbers with the various 2015 purchases, he does not establish that the stock certificate numbers correspond to either tranche. In his brief Mr. Alioto includes a summary that purports to supply the missing connection, but "[s]tatements on brief are not evidence and cannot supplement the record." *Rogers v. Commissioner*, T.C. Memo. 2018-53, at \*33 (first citing Rule 143(c); then citing *Niedringhaus v. Commissioner*, 99 T.C. 202, 214 n.7 (1992); and then citing *Kronish v. Commissioner*, 90 T.C. 684 (1988)).[12] In short, Mr. Alioto has not supported his contention that he sold 36 shares of high-basis stock as would generate the supposed capital loss.

Moreover, we are not persuaded that Mr. Alioto's basis in treasury stock was $4,000 per share. Section 351(a) provides that "[n]o gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in

---

[11] As stated above, the Commissioner bears the burden of proof as to the disallowance of capital losses of $1,283 as alleged in his amendment to answer. The Commissioner does not specifically address this point on brief and thus has failed to satisfy his burden.

[12] Our reluctance to rely on the summary in Mr. Alioto's brief is bolstered because of inconsistencies with trial evidence. For example, a 2015 Probity stock ledger shows that Mr. Alioto gave one share to his son, one share to his stepson, and ten shares to a member of his advisory board. Mr. Alioto testified that he had made gifts of shares, including a gift to his son. The summary document treats these acknowledged gifts as sales of shares with a basis of $4,000 each, introducing a $48,000 loss plainly contrary to the evidence. *See, e.g.*, *Hughes v. Commissioner*, T.C. Memo. 2015-89, at \*23–24 ("As a general matter, a donor does not realize income from making a gift.").

[*14] control . . . of the corporation," which is generally defined as ownership of 80% of the total number of shares of voting and other classes of stock of the corporation. *See* I.R.C. § 368(c). Section 351(h)(2) contains a cross reference to section 358 to determine "the basis of stock or property received in an exchange to which this section applies." In pertinent part section 358(a)(1) provides that the "basis of the property permitted to be received under . . . section [351] without the recognition of gain or loss shall be the same as that of the property exchanged."

Here, Mr. Alioto entered a promissory note of $500,000 in exchange for stock in a corporation in which he owned 100% of the shares immediately after the exchange. The basis of the 125 shares of stock he received thus "shall be the same as that of the property exchanged," i.e., the promissory note. *Id.* We have previously held that a taxpayer incurs no cost in making such a note and that the basis to the taxpayer is zero. *See Alderman v. Commissioner*, 55 T.C. 662, 665 (1971). *But see Peracchi v. Commissioner*, 143 F.3d 487, 493 n.14 (9th Cir. 1998) (finding basis in the face amount of a promissory note "contributed to an operating business which is subject to a non-trivial risk of bankruptcy or receivership"), *rev'g* T.C. Memo. 1996-191. The basis of the shares accordingly is zero.

Even apart from these statutory provisions governing nonrecognition, we have serious misgivings about the $500,000 promissory note at the heart of Mr. Alioto's argument. When a debt instrument is exchanged for property, the purchaser's basis in the property generally is the issue price of the debt instrument. Treas. Reg. § 1.1001-1(g); *see also Corbin W. Ltd. P'ship v. Commissioner*, T.C. Memo. 1999-7, 1999 WL 13704, at *3 (observing that a "promissory note is generally included" in basis). "To be included in the cost of the property, the promissory note must reflect a genuine debt." *Corbin W. Ltd. P'ship v. Commissioner*, 1999 WL 13704, at *3. "The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." *Medieval Attractions N.V. v. Commissioner*, T.C. Memo. 1996-455, 1996 WL 583322, at *53.

Although the "existence of an obligation is the sine qua non of a debt . . . [t]he giving of a note or other evidence of indebtedness which may be legally enforceable is not in itself conclusive of the existence of a bona fide debt." *McCarthy v. Commissioner*, T.C. Memo. 2020-74, at *23. "[A] stated obligation to pay a fixed sum of money may be disregarded as having no value where the facts show that the parties did not

**[\*15]** contemplate that the obligation would be met." *Estate of Maxwell v. Commissioner*, 98 T.C. 594, 605 (1992), *aff'd*, 3 F.3d 591 (2d Cir. 1993); *see also Durkin v. Commissioner*, 87 T.C. 1329, 1376–77 (1986), *aff'd*, 872 F.2d 1271 (7th Cir. 1989); *Corbin W. Ltd. P'ship v. Commissioner*, 1999 WL 13704, at \*3 ("[I]f a recourse debt has no reasonable likelihood of being paid, then the recourse note . . . should not be included in basis."). As we have explained in a similar context, for a bona fide debt to exist, the parties to a transaction "must have had an actual, good-faith intent to establish a debtor-creditor relationship," in which "the debtor intends to repay . . . and the creditor intends to enforce repayment." *Allen v. Commissioner*, T.C. Memo. 2023-86, at \*14; *see also Dietrick v. Commissioner*, 881 F.2d 336, 340 (6th Cir. 1989), *aff'g* T.C. Memo. 1988-180; *Litton Bus. Sys., Inc. v. Commissioner*, 61 T.C. 367, 377 (1973).

Bearing in mind that transactions between closely held corporations and their shareholders must be examined with special scrutiny, *see Elec. & Neon, Inc. v. Commissioner*, 56 T.C. 1324, 1339 (1971), *aff'd*, 496 F.2d 876 (5th Cir. 1974) (unpublished table decision), *and aff'd sub nom. Jiminez v. Commissioner*, 496 F.2d 876 (5th Cir. 1974) (unpublished table decision), we are unconvinced that Mr. Alioto and Probity intended to create a genuine debt. Although the note contained a fixed maturity date (February 5, 2018) and rate of interest (3% per annum), there was no schedule of payments of principal or interest. Moreover, there was no clear source of income that might assure Probity that the debt would be repaid. In fact, the note gave Mr. Alioto the unilateral right to apply outstanding amounts due to him (from Probity, which he controlled) under the employment agreement, i.e., $550,000 on January 31, 2018, to offset his obligations under the promissory note to pay $500,000 (plus interest) on February 5, 2018, making actual repayment wholly in Mr. Alioto's control and exceedingly unlikely.[13] Mr. Alioto's testimony on this point itself suggests that the two agreements were meant to cancel each other out, with no indication that Probity planned to pay Mr. Alioto anything under the employment agreement or that Mr. Alioto planned to pay under the promissory note.

---

[13] Mr. Alioto's opportunity to unilaterally extinguish his debt by offset distinguishes this case from *Peracchi v. Commissioner*, 143 F.3d at 493 n.14, where the U.S. Court of Appeals for the Ninth Circuit found that the taxpayer risked liability on the note in the case of the bankruptcy of his closely held corporation.

**[\*16]**  In summary, Mr. Alioto has failed to demonstrate his basis in the stock he sold, and we conclude that his sales generated a capital gain of $142,170.

B.  *Deductions*

Section 162 generally allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred by the taxpayer in carrying on a trade or business.  An expense is "ordinary" if it is "normal, usual, or customary" within a particular trade or business.  *Deputy v. du Pont*, 308 U.S. 488, 495 (1940).  It is necessary if it is appropriate and helpful for the business.  *Welch v. Helvering*, 290 U.S. at 113.

The trade or business of a taxpayer is separate and distinct from the trade or business of a corporation owned by that taxpayer.  *See Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 438–39 (1943); *Das v. Commissioner*, T.C. Memo. 1998-353, 1998 WL 712465, at \*2.  As the corporation is a separate taxable entity, expenses paid or incurred in carrying on the trade or business of the corporation are deductible by the corporation rather than by its shareholders.  I.R.C. § 162(a); *du Pont*, 308 U.S. at 494; *Espaillat v. Commissioner*, T.C. Memo. 2015-202, at \*18.  Even where shareholders personally pay the ordinary and necessary expenses of the corporation's trade or business, "[s]uch payments constitute either capital contributions or loans to the corporation and are deductible, if at all, only by the corporation." *Gantner v. Commissioner*, 91 T.C. 713, 725 (1988) (first citing *du Pont*, 308 U.S. at 494; and then citing *Rink v. Commissioner*, 51 T.C. 746, 751 (1969)), *aff'd*, 905 F.2d 241 (8th Cir. 1990).  In short, "[s]hareholders cannot deduct as personal expenses such expenses that further the business of the corporation." *Das v. Commissioner*, 1998 WL 712465, at \*2; *see also Leamy v. Commissioner*, 85 T.C. 798, 809 (1985).

Mr. Alioto is not entitled to claim any Schedule C deductions with respect to Probity, a separate taxable entity.  Although Mr. Alioto suggested at trial the business expenses stemmed from his strategic consulting business, not the corporation, we are wholly unpersuaded. Mr. Alioto's own testimony establishes that the expenses related to and

**[\*17]** furthered Probity's business.[14]   As such, any business expense deductions belong to it.[15]

### C.    *Additions to Tax*

The Commissioner determined additions to tax for failure to file and failure to pay pursuant to section 6651 and for the underpayment of estimated taxes pursuant to section 6654 for 2015.  Generally, the Commissioner bears the burden of production concerning penalties or additions to tax and must introduce evidence that imposing those additional amounts is appropriate.   I.R.C. § 7491(c); *Wheeler v. Commissioner*, 127 T.C. 200, 206 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008).   Although Mr. Alioto challenged these additions to tax in his petition, he did not contest them in his posttrial brief and thus abandoned any challenge to the additions to tax.  *See, e.g.*, *Thiessen v. Commissioner*, 146 T.C. 100, 106 (2016) ("[I]ssues and arguments not advanced on brief are considered to be abandoned."); *Rockafellor v. Commissioner*, T.C. Memo. 2019-160, at \*12; *Rose v. Commissioner*, T.C. Memo. 2019-73, at \*39; *see also* Rule 151(e)(4) and (5).  Mr. Alioto is thus liable for the additions to tax under sections 6651(a)(1) and (2) and 6654.[16]

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[14] Mr. Alioto's home office expenses might be seen to present a slightly different case.  The Commissioner, however, established that Mr. Alioto improperly claimed this deduction in connection with Probity, and the burden thus switched to Mr. Alioto to show proper grounds for this deduction.  He failed to do so.  *See* I.R.C. § 280A(c)(1).

[15] Even if Mr. Alioto were permitted to claim these deductions, we would conclude that Mr. Alioto does not offer adequate substantiation with respect to any of the expenses claimed (especially with respect to the categories of expenses subject to strict substantiation under section 274(d)).  Although Mr. Alioto attempts to supply some support for the expenses in his brief, statements in briefs are not evidence, *see, e.g.*, *Barrios*, T.C. Memo. 2023-32, at \*5 (citing *Rogers*, T.C. Memo. 2014-141, at \*15), and, in any event, the information falls short of substantiating that any of the expenses were ordinary and necessary business expenses.

[16] We note that even if Mr. Alioto had not abandoned his challenge, the Commissioner's evidence at trial satisfied his burden to show that Mr. Alioto failed to file his required return, pay taxes, or pay estimated taxes for 2015.